UNITED STATES of America,
Plaintiff–Appellee,

v.

Luis ROSADO and Carmelo Sanchez,
Defendants–Appellants.

Nos. 88–1170, 88–1201.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1988.

Decided Feb. 3, 1989.

Mark W. Solock, Michael D. Monico, Monico & Pavich, Chicago, Ill., for defendants-appellants.

David A. Glockner, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before COFFEY, RIPPLE, and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Defendants-appellants Luis Rosado and Carmelo Sanchez appeal their criminal convictions on various drug and weapon violations. After ·a bench trial, the district court found Mr. Rosado guilty of knowing and intentional distribution of cocaine in violation of 21 U.S.C. § 841(a)(1), conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, and carrying a firearm during a drug trafficking offense in violation of 18 U.S.C. § 924(c). The district court sentenced him to serve two consecutive five-year sentences, as well as a consecutive term of probation. A jury found Mr. Sanchez guilty of having knowingly and intentionally distributed cocaine in violation of 21 U.S.C. § 841(a)(1) and conspiring to

distribute cocaine in violation of 21 U.S.C. § 846. Because this latter crime implicated Mr. Sanchez in the same conspiracy as Mr. Rosado, Mr. Sanchez was also found liable for his coconspirator's firearm charge. Mr. Sanchez received consecutive sentences of eight and five years, as well as a period of supervised release after the termination of his incarceration.

Mr. Rosado appeals only his conviction for use and carrying of a firearm during a drug trafficking offense. 18 U.S.C. § 924(c). Mr. Sanchez appeals: (1) his own liability on the firearm charge;[1] and (2) his conviction for distribution of a kilogram of cocaine.

We affirm the defendants' convictions.

## I

## FACTS

This case results from the efforts of a three-month investigation by Drug Enforcement Administration (DEA) agents in early 1987. In February and March 1987, undercover Agent Mary Quarles and a confidential informer established contact with and made one- and two-ounce purchases of cocaine from Luis Gomez (an original codefendant who testified for the government) and defendant Carmelo Sanchez. Defendant Luis Rosado supplied Gomez with cocaine for one of these transactions, and sold directly to Agent Quarles on another occasion. After one early transaction, Mr. Sanchez was arrested, but was released without being charged. When Gomez met Mr. Sanchez on the street the following week, Mr. Sanchez gave him a telephone pager number at which he could be contacted to arrange further sales of cocaine. Despite Mr. Sanchez's earlier arrest, Agent Quarles retained the confidence of these men and sought to make a one-kilogram purchase.

On the morning of April 29, 1987, the drug purchase trap was set by the DEA agents. Gomez had agreed to make the sale; the price was set at $35,000 in cash; the transaction was to take place in a park-

ing lot near the intersection of Clark Street and Highland Avenue in Chicago. Backup agents had staked out the area ahead of time; two agents arrived earlier in a surveillance van equipped with opaque windows and parked at the location.

As noon approached, the agents first saw Mr. Rosado make a phone call from a public telephone outside a nearby restaurant— he was wearing a pink T-shirt at the time. He then got into a red Nova and drove it down an alley onto Clark Street, stopping briefly to pick up Gomez. At 12:18 p.m., the Nova drove back up the alley, followed closely by a white van; both pulled into the parking lot. The white van parked facing in the same direction as the Nova, separated by a space of only thirty feet. In the parking lot, the surveillance van sat about thirty feet away from the white van and about seventy-five feet away from the Nova.

Mr. Rosado and Gomez got out of the Nova and were joined by the driver of the white van. Upon emerging from the car, Mr. Rosado now sported a leather jacket over his T-shirt. The temperature on that late-April afternoon was around eighty degrees. After about five minutes of waiting for Agent Quarles and her companion to arrive, Mr. Rosado commented on the day's warm weather and removed the jacket, placing it on the front seat of the Nova. The car windows were open and the doors were unlocked.

About fifteen minutes later, a car carrying Agent Quarles and the confidential informer arrived in the parking lot. Mr. Rosado and Gomez approached the car and the driver of the white van returned to his vehicle. Mr. Rosado and Agent Quarles then walked over to the white van. Mr. Rosado climbed in while Agent Quarles stayed outside, leaning on the side door. He showed her the prepackaged kilogram of cocaine. A minute later, Agent Quarles moved away and flashed a prearranged signal that resulted in the immediate arrests of Mr. Rosado, Gomez, and the driver of the white van.

---

**1.** Mr. Sanchez was convicted on the basis of the joint liability rule for coconspirators. *See Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *see also United*

States v. Diaz, 864 F.2d 544, 548 (7th Cir.1988); *United States v. Gironda,* 758 F.2d 1201 (7th Cir.), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985).

During a subsequent search, an agent removed Mr. Rosado's leather jacket from the Nova. In an inside pocket was found a functional .38 caliber revolver loaded with five rounds. A search of the white van revealed a kilogram of cocaine divided into two plastic trays. Later analysis revealed the fingerprint of Mr. Sanchez on one of the trays.

The van search also produced one of two telephone pagers that Mr. Sanchez had rented after his earlier arrest for drug distribution. Telephone records produced at trial disclosed numerous calls from Mr. Rosado to the second pager that Mr. Sanchez had rented—the one not found in the van. The government argued at trial that these records demonstrated how Mr. Sanchez attempted to minimize his visibility after his first arrest. According to the government, Gomez used one of Mr. Sanchez's pager numbers to receive orders from outside customers, and the other to contact Mr. Sanchez for cocaine supply. Tr. 662–65.

## II

## ANALYSIS

### A.

◼ In this appeal, the defendants challenge the district court's determination that Mr. Rosado "used" or "carried" the revolver in violation of 18 U.S.C. § 924(c). That statute provides, in relevant part, that:

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime,, [sic] be sentenced to imprisonment for five years....

(2) For purposes of this subsection, the term "drug trafficking crime" means any felony violation of Federal law involving the distribution, manufacture, or importation of any controlled substance (as defined in section 102 of the Controlled Substances Act (21 U.S.C. 802)).

18 U.S.C. § 924(c). The defendants submit that the facts of this case—where Mr. Rosado's revolver was never displayed to any person at the scene and was in the pocket of his jacket, which was in his car parked thirty feet from the transaction—do not satisfy the "use" or "carry" requirement of the statute.

As in all cases of statutory interpretation, the starting point for our analysis of section 924(c) is the plain language employed by Congress. *Indiana Port Comm'n v. Bethlehem Steel Corp.*, 835 F.2d 1207, 1210 (7th Cir.1987); *see also United States v. Rawlings*, 821 F.2d 1543, 1545 (11th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987) ("When examining [section 924(c)], we must assume that Congress used the words of the statute as they are commonly and ordinarily understood."). Here, Congress stated that anyone who *"uses* or *carries* a firearm"* during certain drug trafficking offenses shall be subject to an additional five years of imprisonment. 18 U.S.C. § 924(c) (emphasis supplied). Although the weapon was not on Mr. Rosado's person at the moment of his arrest, he clearly "used" and "carried" a firearm in violation of section 924(c).[2] The evidence adduced at trial establishes that Mr. Rosado put on and wore the jacket containing the concealed weapon to the transaction, availing himself of the protection a gun would offer in the acquisition and subsequent transportation of $35,000. Moreover, the agents' testimony could reasonably lead a trier of fact to conclude that Mr. Rosado carried the firearm while conferring with his coconspirators at the transaction site, and while waiting for the undercover buyers to arrive. As the district court recognized, the fact that he "never had an opportunity to brandish or discharge his gun does not mean that he did not 'use' it." *United States v. Moore*, 580 F.2d 360, 362 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978). Its presence "increased the likelihood of success; with-

---

**2.** As the Ninth Circuit recently pointed out in *United States v. Ramos,* 861 F.2d 228, 230 (9th Cir.1988), "[t]he *actus reus* for [drug trafficking] crimes includes activities leading up to the mo-

ment when a physical exchange of cocaine for cash occurred.... [T]hese offenses necessarily involve a period of time prior to the final exchange of drugs...."

out [it] he probably would not have sallied forth." *Id.* As the Eighth Circuit noted in *United States v. LaGuardia,* 774 F.2d 317 (8th Cir.1985), "[w]e have recognized the utility of firearms in advancing criminal adventures in narcotics.... Weapons can be used for protection or intimidation and therefore facilitation of illegal transactions." 774 F.2d at 321 (citing *United States v. Milham,* 590 F.2d 717, 721 (8th Cir.1979), and *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976)). Mr. Rosado's removal of the jacket at the scene of the crime because of the warm weather, combined with the fortuity of a delay in Agent Quarles' arrival, certainly did not constitute an abandonment of the weapon. He placed the weapon-containing jacket on the front seat of his open car, which was parked but a short distance away. The trial judge, sitting as trier of fact, certainly was entitled to conclude that the presence of a loaded revolver so close at hand provided Mr. Rosado with the security and confidence needed to undertake such a large cocaine transaction. As then-Judge Kennedy noted in *United States v. Stewart,* 779 F.2d 538 (9th Cir.), *cert. denied,* — U.S. ——, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987):

> If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred, then there is a violation of the statute.

*Id.* at 540.

■ We caution that our holding today affords us no opportunity to delineate precisely the outer limits of this statute's reach. Certainly, Congress did not intend that it be given a cramped reading. On the other hand, as the Ninth Circuit emphasized in *Stewart,* there always must be "some relation or connection between the underlying criminal act and the use or possession of the firearm." *Stewart,* 779 F.2d

at 540. *Accord United States v. Robertson,* 706 F.2d 253 (8th Cir.1983) (per curiam) (no firearm "use" absent evidence that defendant ever carried weapon or that weapon played role in loansharking). The evidence of record in this case places Mr. Rosado's conduct squarely within the ambit of the statute. Moreover, as our recent decision in *United States v. Diaz,* 864 F.2d 544 (7th Cir.1988), firmly establishes, Mr. Sanchez is also liable under this statute because he participated with Mr. Rosado in the conspiracy to distribute cocaine under circumstances where one could reasonably expect that a weapon would be carried.

### B.

■ In his appeal, Mr. Sanchez also submits that the prosecutor's utterance of the phrase "organized crime" during his closing argument was so prejudicial as to have denied him the right to a fair trial, and thus constitutes an error requiring reversal of his conviction for cocaine distribution. Sanchez Br. at 19. Recently, this court stated that in deciding on the prejudicial effect of prosecutorial comments

> [t]he question to be decided is whether ... statements were so inflammatory and prejudicial to the defendant as to deprive him of a fair trial and thus deprive him of his liberty without due process of law as proscribed by the Fourteenth Amendment.

*United States v. Zanin,* 831 F.2d 740, 743 (7th Cir.1987) (quoting *Clark v. Fike,* 538 F.2d 750, 760 (7th Cir.1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977) (quoting *Kirk v. Petrelli,* 331 F.Supp. 792, 795–96 (N.D.Ill.1971), *aff'd,* 492 F.2d 1245 (7th Cir.1974))). *See also United States v. Young,* 470 U.S. 1, 12, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985) (reviewing court to focus on the "probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly").

Here, the prosecutor's remarks, when viewed in context, cannot be construed as prejudicial to Mr. Sanchez. The trial transcript reads:

> PROSECUTOR: The law is not blind to organized crime, criminal activity, organized criminal activity.

DEFENSE: Objection. Objection.

PROSECUTOR: The law is not blind to a crime of narcotics, conspiracy. The law recognizes those who control narcotics, organize to do what they can do to insulate themselves successfully from prosecution.

Tr. at 642.

The prosecutor's remark appears not as an attempt to link the defendant to organized crime, but rather, an attempt to explain the concept of coconspirator liability to the jury. Thus, Mr. Sanchez's argument fails.

### CONCLUSION

For the foregoing reasons, the judgments of conviction of Luis Rosado and Carmelo Sanchez are affirmed.

AFFIRMED.