**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Aureliano Galindo VASQUEZ,**
**Defendant–Appellant.**

**No. 89–1908.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 15, 1990.

Decided Aug. 1, 1990.

Rehearing and Rehearing In Banc Denied Oct. 26, 1990.

Thomas M. Durkin, Sean Martin, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Thomas D. Decker, Richard H. McLeese, Decker & Associates, Chicago, Ill., for defendant-appellant.

Before WOOD, Jr., COFFEY, and FLAUM, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

At the conclusion of his bench trial, defendant-appellant Aureliano Galindo Vasquez was convicted of possession of 112 kilograms of heroin and fifty-seven kilograms of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and knowingly using and carrying firearms during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c). Vasquez received a 300–month sentence of imprisonment for his conviction under 21 U.S.C. § 841(a)(1) and a consecutive sixty month sentence of imprisonment for his 18 U.S.C. § 924(c) conviction.

## I. FACTUAL BACKGROUND

On April 20, 1988, members of the Chicago Police Department's Gang Crimes South unit began surveillance of Aureliano Vasquez. The police followed Vasquez to a garage located on a grassy vacant lot that had no visible address. The garage directly abutted a public alley. The garage had an overhead door that swung out into the alley and a door that was boarded up and nailed shut. The overhead door was secured with both a standard key-lock integrated in the door and a large padlock. Vasquez unlocked the garage door with keys, raised the door only high enough so that he could enter by crouching down, and quickly closed the door behind him. Vasquez entered the garage empty-handed, but he emerged several minutes later with a partially filled green plastic garbage bag. After locking both locks to the overhead door, Vasquez drove his car to a house in Burnham and went inside carrying the plastic garbage bag. After approximately

ten minutes, Vasquez left the house without his garbage bag.

Vasquez then drove to a hot dog stand and made a short phone call from a public telephone. Vasquez returned to the garage, went inside in the same furtive manner as before, and again exited with a partially filled green plastic bag. Vasquez deposited this plastic bag at an apartment building. Before terminating their surveillance for that day, the officers observed the tireless Vasquez return once more to the garage and depart with another green garbage bag with unknown contents.

On May 19, 20, and 23, the officers conducted surveillance near the garage and observed Vasquez perform the same covert ritual of entering the garage in a crouch and then transporting partially filled plastic garbage bags to the same apartment building he had visited on April 20. The officers observed no one other than Vasquez enter the garage during the entire period of surveillance.

Officer Williams had a conversation with a confidential informant on May 24, 1988, who informed him that the garage contained a large amount of cocaine. Officer Williams then enlisted the aid of Detective Thomas Kinsella of the Drug Enforcement Agency and his certified narcotics detection dog "Rex." Officer Kinsella brought Rex to the alley abutting the garage for a sniff. When Rex reached the garage, he barked excitedly and pawed at the overhead door that Vasquez had used when entering and exiting the garage. Rex's behavior was his way of indicating that narcotics were close at hand. Confident that the garage contained drugs, Officer Williams obtained a warrant to search the garage based upon Rex's alert to the presence of drugs and the confidential informant's tip.

The officers executed the warrant later that day. Inside the garage, the officers found an inoperative Ford Thunderbird with kilograms of narcotics on the floor of the passenger compartment and inside the trunk. Officer Williams testified at the defendant's trial that the trunk was stuffed with "softball size packages of drugs" and that "you couldn't have put a baseball into the trunk it was so stuffed." Williams also stated that the officers found one loaded handgun and three handguns with unloaded clips "shoved in with the narcotics in the trunk." After seizing the drug cache, the officers waited in and near the garage for Vasquez to return.

At 6:00 that evening Vasquez returned to the garage. The officers arrested him after he opened the overhead door with his key. When he was arrested, Vasquez was carrying a pager, an address book, keys to the Thunderbird's trunk ignition switch and doors, and keys for the locks on the overhead garage door. The government later determined that the seized guns were capable of being fired.

Prior to trial, Vasquez filed a motion to suppress the narcotics and guns that were seized at the scene of the crime and a motion to dismiss the section 924(c) charge on the ground that he did not "use" or "carry" the recovered firearms. On appeal, Vasquez challenges the district court's ruling on his suppression motion, the sufficiency of the evidence supporting his conviction under 18 U.S.C. § 924(c), and the propriety of the district court's upward departure from Vasquez's sentencing range on the basis of the quantity of drugs involved in his offense.[1] We affirm Vasquez's conviction and sentence for the reasons that follow.

## II. MOTION TO SUPPRESS

■ Vasquez contends that the trial court erred when it ruled that the use of a certified narcotics detection dog to sniff the garage did not constitute a search within the meaning of the fourth amendment. Furthermore, Vasquez asserts that the trial court also erred in holding that even if the warrant in this case was invalid because of the allegedly illegal dog sniff "search," the *Leon* "good faith" exception

1. The defendant-appellant's Motion for Leave to File a Response to the Government's Submission of Supplemental Authority is GRANTED.

to the exclusionary rule applied because the officers executed the search in objective good-faith reliance on a search warrant issued by neutral magistrate. *See United States v. Leon,* 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984). Of course, if we determine that a dog sniff is not a fourth amendment search or that the sniff search was supported by a reasonable suspicion, based upon articulable facts, that the garage contained contraband, Vasquez's "fruit of the poisonous tree" argument will wither on the branch.

In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court noted that a sniff test of seized luggage at an airport is not a fourth amendment search requiring probable cause and a search warrant. *Id.* at 707, 103 S.Ct. at 2644. The Court reasoned that a canine sniff, unlike other investigative techniques, exposes only criminality and not other legitimately private interests:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment entailed in less discriminate and more intrusive investigative methods.

*Id.* (citation omitted). In *United States v. Jacobsen,* 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), the Court reaffirmed its statement in *Place* that official conduct such as a canine sniff of an inanimate object does not compromise any legitimate interest in privacy. The *Jacobsen* Court relied on *Place* when it held that conducting a field test to "merely disclose whether or not a particular substance is cocaine" is not a "search" within the meaning of the fourth amendment. *Id.* at 123–26, 124 n. 24, 104 S.Ct. at 1661–63, 1662 n. 24.

Since *Place* was decided, we too have consistently held that a canine sniff test that is used to detect the presence of contraband is not a fourth amendment search. *See United States v. Mayomi,* 873 F.2d 1049, 1054 n. 5 (7th Cir.1989); *United States v. Teslim,* 869 F.2d 316, 323 (7th Cir.1989); *United States v. Rivera,* 825 F.2d 152, 158 (7th Cir.), *cert. denied,* 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987). *See also United States v. Beale,* 736 F.2d 1289, 1290–91 (9th Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *United States v. Klein,* 626 F.2d 22, 24–25 (7th Cir.1980) (pre-*Place*). Thus, the trial court correctly ruled that subjecting the garage to a "sniff-test" from a public alley was not a warrantless search. We do not reach the issue of whether a showing of "reasonable suspicion" is necessary to initiate a dog sniff search that is more intrusive and that exposes private information other than the presence of contraband. *See United States v. Colyer,* 878 F.2d 469, 477–83 (D.C.Cir.1989); *Horton v. Goose Creek Indep. School Dist.,* 690 F.2d 470, 475–80 (5th Cir.1982), *cert. denied,* 463 U.S. 1207, 103 S.Ct. 3536, 77 L.Ed.2d 1387 (1983); *United States v. Goldstein,* 635 F.2d 356, 360–62 (5th Cir.), *cert. denied,* 452 U.S. 962, 101 S.Ct. 3111, 69 L.Ed.2d 972 (1981).

The only challenge raised to the warrant is that the affidavit was tainted because it relied on information secured through the sniff search in violation of the fourth amendment. Because we have determined that the sniff search did not result in a fourth amendment violation, the search warrant was not the fruit of the poisonous tree/sniff search. *See Rivera,* 825 F.2d at 158.

## III. SUFFICIENCY OF THE EVIDENCE

■ Vasquez challenges the sufficiency of the evidence supporting the district court's ruling that he "used" the four guns contained in the Thunderbird's trunk in violation of 18 U.S.C. § 924(c). Subsection 924(c) provides in part that:

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime ... uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years

. . . .

(2) For purposes of this subsection, the term "drug trafficking crime" means any felony punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement Act (46 U.S.C.App.1901 et seq.).

18 U.S.C. § 924(c)(1)–(2). Vasquez asserts that the evidence at trial of the presence of the four handguns in the trunk of the Thunderbird was insufficient to support a conviction under section 924(c). Vasquez maintains that there was no evidence that the firearms were readily accessible and therefore that they played a role in the offense. In reviewing the evidence against Vasquez, we must view the evidence in the light most favorable to the prosecution and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Muehlbauer*, 892 F.2d 664, 667 (7th Cir.1990).

In *United States v. Rosado*, 866 F.2d 967, 970 (7th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 117, 107 L.Ed.2d 79 (1989), we discussed the meaning of the word "use" in section 924(c). We quoted then-Judge Kennedy's observation in *United States v. Stewart*, 779 F.2d 538 (9th Cir. 1985), *cert. denied*, 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987), that:

"If the firearm is within the possession or control of a person who commits an underlying crime as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon to protect himself or intimidate others, whether or not such display or discharge in fact occurred, then there is a violation of the statute."

*Rosado*, 866 F.2d at 970 (quoting *Stewart*, 779 F.2d at 540). The evidence in *Rosado* established that the defendant wore a jacket containing the concealed weapon to a drug transaction, but that he removed the jacket and left it and the gun in his automobile when he conducted a drug transaction inside another vehicle a short distance away. We found that Congress did not intend that the statute be given a "cramped reading," *id.*, and that Rosado clearly used and carried the handgun during his drug trafficking offense. *Id.* at 969.

■ Lack of an opportunity to brandish or shoot his weapon did not mean that Rosado did not "use" the gun; nor does the fortuitous absence of a threatening occasion for Vasquez to sally forth with his arsenal rescue him from culpability under the statute. *See id.* at 969–70; *United States v. Moore*, 580 F.2d 360, 362 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978). A gun is "used" under the statute if its presence " 'increased the likelihood of success' " of the drug offense as a means of protection or intimidation, *see Rosado*, 866 F.2d at 970 (quoting *United States v. LaGuardia*, 774 F.2d 317, 321 (8th Cir.1985)), or if its presence provides the defendant with the "security and confidence needed to undertake such a large cocaine transaction." *Id.*

The evidence presented at Vasquez's trial established that the firearms were located in the trunk amidst a staggering cache of narcotics. Vasquez acted circumspectly when he visited the garage, and demonstrated a natural fear that his extraordinarily large drug supply would be discovered. On one occasion, Vasquez betrayed his

fear of being pursued from the garage by taking an evasive route up and down side streets, which turned a ten-minute drive into a forty-five minute commute. The guns were at the ready every time Vasquez delved into his narcotics-laden Thunderbird. The trier of fact could reasonably conclude that the availability of firearms instilled Vasquez with a heightened sense of security while he possessed the drugs with the intent to distribute them. This is not a case where a defendant is penalized for fortuitously " 'hav[ing] a gun in his possession when he commits an entirely unrelated offense.' " *United States v. Stewart,* 779 F.2d 538, 539 (9th Cir.1985) (quoting *United States v. Moore,* 580 F.2d 360, 362 (9th Cir.), *cert. denied,* 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978)).

A rational trier of fact could find that the presence of four firearms in an isolated building used only to store a massive amount of narcotics, which was frequently visited by only the distributor of the drugs, evinced a "use" of firearms by the defendant to provide security and confidence. *See United States v. Matra,* 841 F.2d 837, 842–43 (8th Cir.1988) (weaponry protected large quantities of cocaine in house, "use" under the statute); *United States v. Robinson,* 857 F.2d 1006, 1010 (5th Cir.1988) (jury could reasonably conclude that guns "used" as integral part of drug offense as "an integral means of protecting [the defendant's] possession of the cocaine"); *LaGuardia,* 774 F.2d at 321 ("use" of weapons where they had "undoubted utility in the protection of the valuable [drug] supply and of the cash on hand"). It was certainly logical for the trial judge to conclude that under the circumstances Vasquez had an evident need for weaponry that was readily available in the event a covetous competitor or a group of government agents arrived to appropriate his hoard. Vasquez's argument that there was an equally rational inference—that the guns were buried under the trunkload of narcotics and therefore inaccessible—overlooks our obligation to consider the evidence in the light most favorable to the government and not the defendant. *See United States v. Durrive,* 902 F.2d 1221, 1229 (7th Cir.1990); *United States v. Molinaro,* 877 F.2d 1341, 1348 (7th Cir.1989).

## IV. DEPARTURE FROM THE SENTENCING GUIDELINES

■ Judge Williams found Vasquez guilty of possession of 112 kilograms of heroin and fifty-seven kilograms of cocaine with intent to distribute, pursuant to 21 U.S.C. § 841(a)(1). Under the Sentencing Guidelines ("Guidelines"), the applicable base offense level for Vasquez's offense and the amount of drugs involved was level 36. Guidelines § 2D1.1. At the time of Vasquez's sentencing, level 36 was the highest base offense level available for one convicted under 21 U.S.C. § 841(a)(1), and a defendant rose to this pinnacle of the base offense levels by possessing ten kilograms of heroin or fifty kilograms of cocaine. Cross-referencing Vasquez's base offense level of 36 with his category I criminal history resulted in a sentencing range of 188 to 235 months.[2] Guidelines, ch. V, pt. A, Sentencing Guidelines Table. Due to the extraordinary amount of drugs seized, the government moved for an upward departure from the guideline range, and requested that the district court impose a sentence of at least 480 months imprisonment. The defendant claimed that he was entitled to a downward departure because he was a neophyte in the drug trade and was not a "high level participant."

The sentencing court disagreed with the defendant's modest description of his involvement in drug trafficking. The district court found that the defendant had "sole control of the narcotics," and that Vasquez

**2.** On November 1, 1989, approximately six months after the defendant's sentencing, an amendment to the Drug Quantity Table, Guidelines § 2D1.1(c), took effect. The amendment essentially added three upper level categories of drug quantities, with concomitantly increased base offense levels, to the Drug Quantity Table and reformulated the table accordingly. If Vasquez were sentenced under the new scheme, which accounts for those, like Vasquez, who are convicted of drug crimes on a grand scale, he would have had a base offense level of 40 and a sentencing range of 292 to 365 months imprisonment.

was "very culpable" and "high up in the chain." The district judge decided to depart upward based upon the enormous quantity of drugs involved in Vasquez's offense and imposed a sentence of 300 months imprisonment. In imposing Vasquez's sentence, the district judge stated:

This is not a situation where we're talking about five kilos or ten kilos beyond what the guidelines are. This is a tremendous amount of narcotics, and I think it would not serve the purposes of the guidelines or the intent of Congress to have a situation where you have one individual who possessed ten kilos that receives a sentence within the guideline range and someone here who has much in excess receives a similar kind of sentence. And so because of the quantities that are involved here, 112 kilos of heroin and 57 kilos of cocaine, the Court feels that an upward departure is warranted.

On appeal, Vasquez challenges only the district court's decision to depart from the Guidelines sentencing range because of the extraordinary amount of narcotics he had nestled in the Thunderbird.

█ We review a district court's decision to depart from the Guidelines sentencing range to determine whether it was reasonable in light of the factors dictated by the Guidelines and the district court's explanation for the departure. 18 U.S.C. § 3742(e); *United States v. Carey*, 895 F.2d 318, 322 (7th Cir.1990); *United States v. Jordan*, 890 F.2d 968, 972 (7th Cir.1989); *United States v. Miller*, 874 F.2d 466, 471 (7th Cir.1989). As this court noted in *Miller*, " '[r]easonableness' implies that a sentencing judge must provide articulable reasons, of a type contemplated by the Act and the Guidelines, and based on a sufficiently sound factual foundation, to justify a departure from the guidelines." 874 F.2d at 471. The Sentencing Commission, however, "did not intend to deprive district courts of 'sensible flexibility' in deciding to depart from the Guidelines." *Jordan*, 890 F.2d at 973.

Under 18 U.S.C. § 3553(b), a district court is obliged to impose a sentence within the applicable guideline range "unless the court finds that there exists an aggravating ... circumstance of a kind, or *to a degree*, not adequately taken into account by the Sentencing Commission...." (emphasis added). The Sentencing Commission itself recognized that courts have broad discretion to depart from the Guidelines in appropriate cases:

[I]n principle, the Commission, by specifying that it had adequately considered a particular factor, could prevent a court from using it as grounds for departure. In this initial set of guidelines, however, the Commission does not so limit the courts' departure powers. The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. *When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.*

Guidelines, pt. A, Introduction 4(b). *Resolution of Major Issues* (Policy Statement) (emphasis added). The Commission also stated that it would monitor and analyze departures from the "initial set" of guidelines in order to later "create more accurate guidelines that specify precisely where departures should and should not be permitted." *Id.*

We find that Vasquez's case presented the district court with the atypical case where upward departure was appropriate. The 112 kilograms of heroin Vasquez possessed was more than eleven times the ten-kilogram quantity listed as the then maximum base offense level 36. Disregarding the heroin, the fifty-seven kilograms of cocaine Vasquez possessed would have placed him at a base offense level of 36. There is no merit in the defendant's suggestion that the initial base offense levels for drug possession only went up to 36 because the Commission "recognized the diminishing utility of quantity as a distinguishing factor." The amended Drug Quantity Table, which now addresses large-quantity dealers like Vasquez, indicates that the Commission does regard drug

quantity as a continually valid distinguishing factor. The Commission's policy statement informing district courts that they may depart from the "heartland" of typical cases each guideline represents when confronted with "conduct [that] significantly differs from the norm," also undermines the defendant's argument that the Sentencing Reform Act and the Guidelines did not contemplate upward departures for defendants convicted of drug crimes involving drug amounts far in excess of the initial Guidelines Drug Quantity Table.

 Vasquez also asserts that because the fraud crime section of the Guidelines, Guidelines § 2F1.1, explicitly allows upward departure based on the quantity of money stolen while the drug crime section lacks such an explicit departure provision, the Commission must have considered and rejected quantity-based upward departures for drug crimes. One of the Guideline's policy statements, however, cautions that the Commission's failure to include a sentencing factor in the Guidelines for one offense, while including it in the Guidelines for others, does not mean that the sentencing factor may not serve as a basis for departure from the former Guideline. Guidelines § 5K2.0. Other courts have found that an upward departure from the guideline for simple possession of narcotics, which does not refer to drug quantity, may be based on drug quantity where the amount possessed is atypical. *See United States v. Crawford*, 883 F.2d 963, 964–66 (11th Cir.1989) (upward departure warranted due to amount and purity of cocaine possessed); *United States v. Ryan*, 866 F.2d 604, 606–10 (3d Cir.1989) (upward departure warranted based on amount of cocaine possessed); *United States v. Correa–Vargas*, 860 F.2d 35, 38 (2d Cir.1988) (quantity of cocaine "sufficiently unusual" to warrant upward departure in conviction for using communication facility in committing drug offense, although Guidelines did not refer to quantity as a factor). We join those courts that have rejected the argument that drug quantity may not serve as the basis for departure from the applicable guideline range when the particular guide-

line does not adequately consider an atypical amount of drugs.

We conclude that the district court reasonably departed from the Guidelines. The circumstance upon which the court based the departure, the defendant's sole possession of an astronomical amount of drugs that far exceeded the upper boundary of the applicable Drug Quantity Table, was "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b). The district judge's thoughtful exposition of the reasons why she believed Vasquez's circumstances were atypical and a departure was therefore warranted has persuaded this court that the decision to depart from the Guidelines was well within the realm of reason.

### V.  CONCLUSION

The conviction and sentence appealed from are AFFIRMED.