**UNITED STATES of America,
Appellant,**

v.

**Osvaldo RODRIGUEZ–MORALES,
Defendant, Appellee.**

**No. 90–1955.**

United States Court of Appeals,
First Circuit.

Heard Feb. 4, 1991.

Decided March 27, 1991.

Sean Connelly, Atty., U.S. Dept. of Justice, with whom Lincoln C. Almond, U.S. Atty., Margaret E. Curran and Lawrence D. Gaynor, Providence, R.I., Asst. U.S. Attys., were on brief, for U.S.

Russell M. Sollitto, North Kingstown, R.I., with whom Joseph A. Bevilacqua, Jr., Providence, R.I., was on brief, for defendant, appellee.

Before BREYER, Chief Judge,
BOWNES, Senior Circuit Judge, and
SELYA, Circuit Judge.

SELYA, Circuit Judge.

This appeal arises out of a pretrial order of the United States District Court for the District of Rhode Island suppressing certain evidence. We have jurisdiction under 18 U.S.C. § 3731. The appeal highlights important aspects of the interface between the fourth amendment and the constabulary's community caretaking function. It also presents us with an opportunity to clarify the law in this circuit concerning canine sniff tests. Believing, as we do, that the district court erred in its formulation of the applicable legal principles, we reverse and remand with directions to vacate the suppression order.

## I. THE FACTS

On April 20, 1990, two Rhode Island State Police detectives, Thomas Denniston and Thomas O'Hearn, were assigned to drug interdiction duty on Route I–95 in the area of the Rhode Island/Connecticut state line. Their unmarked car was parked on a grassy median strip when, at approximately 10:30 a.m., they observed a Toyota with New York license plates driving northbound in the high speed lane. A passenger was leaning out of the window with his head, arms, and shoulders outside the car. He appeared to be screaming at another northbound vehicle (a Chevrolet). Thinking that an altercation between two moving cars was brewing, the troopers took up dogged pursuit. They radioed for back-up and, in due course, Lieutenant James Dougherty responded.

At a point eight to ten miles from the locus of the initial sighting, the police forced the two civilian vehicles to the roadside. While Lieutenant Dougherty concentrated on the Toyota, the detectives approached the Chevrolet. The driver produced a valid license and registration. He explained that the passenger in the Toyota was merely asking for directions to Boston. In time, the Chevrolet was allowed to depart.

Meanwhile, the driver of the Toyota, defendant-appellee Osvaldo Rodriguez–Morales (Rodriguez), at first produced no driver's license. He identified himself to Dougherty and stated that his date of birth was March 3, 1969. Eventually, Rodriguez produced an expired Puerto Rican license that gave his birth date as March 2, 1969. When Denniston joined Dougherty, he inspected the license closely and found it to be suspect. A second piece of identification tendered by Rodriguez contained yet another date of birth (March 3, 1967). In answer to Denniston's query, Rodriguez told the officers that he was going to Boston to visit his aunt, but he could not provide either her address or telephone number. For that matter, he could not identify his passenger other than by the sobriquet "Sammy." These anomalies prompted Denniston to question the passenger out of Rodriguez's earshot. Identifying himself as Pedro Martinez, the passenger told Denniston that he and the defendant were travelling to Boston to visit Martinez's mother, who was hospitalized.

Computer checks revealed no outstanding warrants for either individual. The computer also confirmed that the Toyota was registered to Rodriguez at an address in the Bronx; that Rodriguez's birth date, as contained in the records of the New York motor vehicle registry, was May 5, 1957; and that Martinez's driver's license was suspended.

To this point, the stop had lasted between fifteen and thirty minutes. The troopers decided to take the two men to the state police barracks for further inquiries. Rodriguez drove his own car to the barracks with O'Hearn as a passenger. Martinez rode with Denniston in the police cruiser. Upon arrival, the vehicles were parked behind the barracks. Rodriguez and Martinez were led into the front reception area and left there, unguarded. (The barracks had restricted entrance but free egress.)

In the meantime, Denniston, mindful that both men spoke English with difficulty, sought out a special agent who was fluent in Spanish. The agent spoke with the men over the telephone; their stories were basically unchanged from the roadside version. Rodriguez was asked, in Spanish, to sign a form consenting to a vehicular search. He refused. Denniston then arranged for a trained "drug dog" to perform a canine sniff around the Toyota's perimeter. The dog reacted in a way that strongly indicated the presence of cocaine.

This development initiated a chain reaction: the defendant and his passenger were placed in a restricted-egress conference room; the Toyota was moved into a garage on the premises; and the troopers obtained a judicial warrant enabling them to search the car. When given access to the passenger side of the car's interior, the dog was excited by the door jamb. The police pried it open, uncovering several bundles of cocaine. Cocaine was also found inside the driver's door. All in all, approximately two kilograms were recovered. Rodriguez was arrested.[1] Traffic citations were issued to him for (1) driving with tinted windows, and (2) driving on an expired license. The

record is tenebrous as to whether the citations were issued before or after the arrest took place.

In due season, Rodriguez was indicted by a federal grand jury for possession of cocaine with intent to distribute. *See* 21 U.S.C. § 841(a)(1) & (b)(1)(B). He moved to suppress the contraband on fourth amendment grounds. After conducting an evidentiary hearing, the district court found that the initial stop of the defendant's car was valid, but that the troopers' subsequent actions during the roadside interlude constituted an arrest (of defendant) and seizure (of the Toyota) without probable cause. On that basis, the court ruled that the fruits of the ensuing vehicle search could not be used against the defendant.

## II. DISCUSSION

■ On appeal, the government contends that, apart from cases where the fourth amendment's warrant requirement is directly implicated, the Constitution only requires that the police act reasonably in matters of search and seizure. *See, e.g., Illinois v. Rodriguez,* — U.S. —, 110 S.Ct. 2793, 2799–2800, 111 L.Ed.2d 148 (1990). That standard, the prosecutor tells us, was satisfied here. We agree.

■ Whether police activity is reasonable in any particular set of circumstances is almost invariably a factbound inquiry. The nisi prius court sees and hears the witnesses and will ordinarily develop a superior "feel" for what transpired. Hence, appellate oversight is correspondingly deferential; the court of appeals reviews the district court's findings of fact following a suppression hearing, including mixed fact/law findings, under the clearly erroneous test. *See, e.g., United States v. Stanley,* 915 F.2d 54, 57 (1st Cir.1990); *United States v. Figueroa,* 818 F.2d 1020, 1024 (1st Cir.1987). Of course, if the lower court applies the wrong legal standard, no deference attaches, and we must proceed to correct the error. *See United States v. LaFrance,* 879 F.2d 1, 4 (1st Cir.1989).

---

1. Martinez was also arrested. His case, however, is not before us.

Both standards of review come into play in this appeal. The trial judge's determination that the troopers had reasonable grounds to stop the Toyota in the first place was fact-dominated and, to some extent, a credibility call. As such, it is subject to classic clear-error scrutiny and easily passes muster. The judge's next determination, however, rested on the fallacious premise that, after effectuating the stop, the troopers needed probable cause in order to impound the defendant's car and move it to the barracks. This was error of a "legal" kind, subject to *de novo* review in the exercise of our appellate jurisdiction. As we shall explain *infra*, the law provides that, so long as the police act reasonably in carrying out their community caretaking function, they can impound a vehicle even though probable cause to search it, or to arrest the driver, may be lacking. And in this case, having lawfully impounded the Toyota, the remaining steps which led to discovery of the cocaine cache did not infract the Constitution.

We proceed step by step through the record to flesh out our conclusion that there was no basis for suppression of the evidence.

### A. *On the Hound.*

■ The first step taken by the police consisted of dogging the defendant's car, flagging it down, and bringing it to a halt on the edge of the highway. A traffic stop can be executed as long as the officers have reasonable grounds to suspect that the person detained was, is, or will be engaged in criminal activity. *See Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984) (analogizing routine traffic stops to pedestrian stop-and-frisk activity pursuant to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). The district court applied this rule forthrightly in upholding the initial stop. The court credited "testimony ... that the officers believe[d] that an altercation was taking place" and found that the defendant's arguably reckless driving conferred a right, indeed a duty, on the officers to intercept the defendant's vehicle. Since this finding derives abundant support

from the record, it cannot be set aside on clear-error review. *See, e.g., Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."); *United States v. Aymelek,* 926 F.2d 64, 68 (1st Cir.1991) (no clear error so long as the record contains "sufficient evidence ... to support a reasoned conclusion"). Hence, the traffic stop itself was reasonable and, therefore, constitutionally valid.

### B. *To the Pound.*

■ The defendant argues that, even if the initial stop was constitutional, Rodriguez's subsequent detention, including his involuntary journey to the police barracks, was a de facto arrest, unsupported by probable cause, and thus improper. Building on this theme, he asserts that the unlawful arrest poisoned the well, irremediably tainting the evidence later procured. The district court believed this was so, grounding its suppression order on this construct. We think that this flawed reasoning led the court down a blind alley, which need not, and should not, have been explored. To be sure, the actions taken by the police following a justified traffic stop must be "reasonably related in scope to the circumstances which justified the [stop] in the first place." *United States v. Lott,* 870 F.2d 778, 784 (1st Cir.1989). But, the actions taken in this case need not be viewed as indivisible. Once the troopers pulled over defendant's car for good cause and discovered that neither he nor his passenger was properly licensed to drive it, the question of what to do with the car was a matter separate and apart from whether the defendant could or could not be arrested. Let us explicate the point.

The policeman plays a rather special role in our society; in addition to being an enforcer of the criminal law, he is a "jack-of-all-emergencies," W. LaFave, *Search and Seizure* § 5.4(c) (2d ed. 1987), expected to aid those in distress, combat actual hazards, prevent potential hazards from mate-

rializing, and provide an infinite variety of services to preserve and protect community safety. Recognition of this multifaceted role led to the Court's coinage of the "community caretaking" label in *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The rubric is a catchall for the wide range of responsibilities that police officers must discharge aside from their criminal enforcement activities. *See id.* at 441, 93 S.Ct. at 2528. Dealing with vehicle-related problems ranks among such responsibilities. Because of the ubiquity of the automobile in modern American civilization, and the automobile's nature—mechanically delicate, highly mobile, safely operable only by trained and licensed individuals—the police are constantly faced with dynamic situations, no two quite identical, in which they, in the exercise of their community caretaking function, must interact with car and driver to promote public safety. Not surprisingly, our fourth amendment jurisprudence has incorporated this reality. *See, e.g., id.; see also South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976) (law officers must frequently take vehicles into police custody "[i]n the interests of public safety and as part of ... [their] 'community caretaking functions'") (quoting *Cady*, 413 U.S. at 441, 93 S.Ct. at 2528).

■ It is important to recognize that the community caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441, 93 S.Ct. at 2528. Thus, as long as such caretaking activities are warranted "either in terms of state law or sound police procedure," *id.* at 447, 93 S.Ct. at 2531, they do not offend the fourth amendment. Consequently, evidence which comes to light during the due execution of the caretaking function is ordinarily admissible at trial. *See Lott*, 870 F.2d at 781. Such a result is consistent with the settled rule that searches and seizures made for routine administrative purposes are deemed noninvestigatory and, therefore,

outside the warrant requirement and the probable cause standard. *See Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 740, 93 L.Ed.2d 739 (1987); *Opperman*, 428 U.S. at 370 n. 5, 96 S.Ct. at 3097 n. 5. The imperatives of the fourth amendment are satisfied in connection with the performance of such noninvestigatory duties, including community caretaker tasks, so long as the procedure employed (and its implementation) is reasonable.

In community caretaking cases, as elsewhere, reasonableness has a protean quality. The term embodies a concept, not a constant. It cannot be usefully refined "in order to evolve some detailed formula for judging cases." *Cady*, 413 U.S. at 448, 93 S.Ct. at 2531; *accord LaFrance*, 879 F.2d at 6 ("what is reasonable in one type of situation may not be reasonable in [an]other"); *cf. Sierra Club v. Secretary of the Army*, 820 F.2d 513, 517 (1st Cir.1987) (defining reasonableness as "a mutable cloud, which is always and never the same") (quoting and paraphrasing Ralph Waldo Emerson). In this instance, then, to find whether the removal of defendant's car from the highway to the barracks was within the troopers' community caretaking function, "we are obliged to look to all the facts and circumstances of this case in light of the principles set forth in [prior] decisions." *Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100.

Here, the police had a legitimate reason for stopping the car and a strong noninvestigatory justification for removing it from the highway. Upon ascertaining that neither occupant was properly licensed to drive, the decision not to let the vehicle continue on its journey was quintessentially reasonable.[2] The ensuing decision—not to leave an automobile on the shoulder of a busy interstate highway—can hardly be faulted; had the officers simply abandoned it, the Toyota not only would have posed a safety threat, but also would have been easy prey for vandals. We think that, under the circumstances, it was completely appropriate for the police to impound the

---

**2.** Such a decision was all the more appropriate given that the men were coming from New York

(several hours away) and bound for Boston (close to two hours away).

car and bring it to the barracks for safe-keeping. *See United States v. Velarde,* 903 F.2d 1163, 1166–67 (7th Cir.1990) (impoundment reasonable where neither occupant had valid license, owner not available, and car located on highway); *United States v. Kornegay,* 885 F.2d 713, 716 (10th Cir.1989) (impoundment reasonable where car was parked in private lot and police did not know identity of operator), *cert. denied,* —— U.S. ——, 110 S.Ct. 2179, 109 L.Ed.2d 508 (1990); *United States v. Brown,* 787 F.2d 929, 932 (4th Cir.) (impoundment reasonable where car's occupants appeared drunk, no known sober person was available to take custody, and the car, if left unattended, could present a nuisance), *cert. denied,* 479 U.S. 837, 107 S.Ct. 137, 93 L.Ed.2d 80 (1986); *United States v. Duncan,* 763 F.2d 220, 224 (6th Cir.1985) (impoundment of vehicle reasonable after arrest of driver on public highway); *United States v. Johnson,* 734 F.2d 503, 505 (10th Cir.1984) (impoundment and towing reasonable where car was parked in private lot, exposed to vandalism, and owner was besotted); *United States v. Griffin,* 729 F.2d 475, 480 (7th Cir.) (impoundment reasonable where neither occupant of car could legally remove it from emergency lane of highway and leaving car there would present hazard and theft risk), *cert. denied,* 469 U.S. 830, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984); *United States v. Staller,* 616 F.2d 1284, 1289–90 (5th Cir.) (impoundment reasonable where car legally parked in mall lot but arrested driver was from out of state and nobody else was available to assume responsibility), *cert. denied,* 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980); *United States v. 1988 B.M.W. 750IL,* 716 F.Supp. 171, 173–74 (E.D.Pa.) (lack of licensed driver sufficient reason for police to impound car parked near street corner and exposed to risk of theft or vandalism), *aff'd without opinion,* 891 F.2d 281, 284 (3d Cir.1989).

■ Defendant says that it was unnecessary for the police to impound the car, pointing in particular to the fact that he was allowed to drive to the barracks, albeit accompanied by a trooper. He argues that he could as easily have been permitted to remove his car to a safe place of his own selection. But, the existence of alternative means of dealing with the automobile, even less intrusive means, does not illegitimate the constables' decision to impound it. When a motor vehicle is left without a licensed driver in the course of a lawful highway stop, the Constitution only requires the police to act reasonably with regard to disposition of the vehicle. There is no requirement that the officers must select the least intrusive way of fulfilling their community caretaking responsibilities. *See Bertine,* 479 U.S. at 373–74, 107 S.Ct. at 742; *United States v. Davis,* 882 F.2d 1334, 1339 (8th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1472, 108 L.Ed.2d 610 (1990); *see also Illinois v. Lafayette,* 462 U.S. 640, 647–48, 103 S.Ct. 2605, 2610, 77 L.Ed.2d 65 (1983) (search of arrestee's personal property at stationhouse was not unreasonable even if less intrusive means existed to achieve legitimate goals of search); *LaFrance,* 879 F.2d at 4 (temporary detention of package must be reasonable under the circumstances; reasonableness need not be judged by "least intrusive means" standard).

Framed precisely, the critical question in cases such as this is not whether the police needed to impound the vehicle in some absolute sense, or could have effected an impoundment more solicitously, but whether the decision to impound and the method chosen for implementing that decision were, under all the circumstances, within the realm of reason. *See Brown,* 787 F.2d at 932. The inquiry into reasonableness always necessitates constructing a balance among competing interests. *See Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979) (fourth amendment reasonableness inquiry involves balancing legitimate government interests against intrusion on individual's rights); *Lopez Lopez v. Aran,* 844 F.2d 898, 905 (1st Cir.1988) (in determining reasonableness, "judges must weigh the need to search or seize against the invasion the search or seizure entails"). In the community caretaker cases, we believe that this "search for equipoise," *Lopez Lopez,* 844

F.2d at 905, almost always involves the exercise of discretion. We explain briefly.

Virtually by definition, the need for police to function as community caretakers arises fortuitously, when unexpected circumstances present some transient hazard which must be dealt with on the spot. The police cannot sensibly be expected to have developed, in advance, standard protocols running the entire gamut of possible eventualities. Rather, they must be free to follow "sound police procedure," *Cady,* 413 U.S. at 447, 93 S.Ct. at 2531, that is, to choose freely among the available options, so long as the option chosen is within the universe of reasonable choices.[3] Where, as here, the police have solid, noninvestigatory reasons for impounding a car, there is no need for them to show that they followed explicit criteria in deciding to impound, as long as the decision was reasonable. *Cf. United States v. Dall,* 608 F.2d 910, 913 (1st Cir.1979) (impoundment leading to inventory search reasonable where "it was the regular practice of the Rhode Island State Police to impound a vehicle in a variety of circumstances, including instances in which an out-of-state driver is stopped, cannot produce an operator's license or identification and is driving a vehicle that belongs to someone else"), *cert. denied,* 445 U.S. 918, 100 S.Ct. 1280, 63 L.Ed.2d 603 (1980).

▓ That the impoundment of defendant's vehicle stemmed in part from an investigatory motive does not change either the analysis or the result. As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure. *Cf., e.g., United States v. Frank,* 864 F.2d 992, 1001 (3d Cir.1988) (that inventory search serves investigatory as well as administrative purpose does not invalidate the search), *cert. denied,* 490 U.S. 1095, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989); *United States v. Orozco,* 715 F.2d 158, 161 (5th Cir.1983) (per curiam) (same). Here, the district court did not find that the impoundment was pretextual, and we, as an appellate tribunal, are in no position to impress such a finding on a record which is scarcely suggestive of a sham. *See United States v. Belt,* 854 F.2d 1054, 1055–56 (7th Cir.1988). At any rate, the impoundment of the Toyota in the exercise of the troopers' community caretaking responsibilities was amply justified on objective grounds. Hence, any speculation into the troopers' subjective intent would be supererogatory. *See United States v. Hadfield,* 918 F.2d 987, 993 (1st Cir.1990).

We need not paint the lily. Because impounding the car resulted from a legitimate use of the troopers' caretaking authority, the question of suppression was unaffected by whether or not Rodriguez was arrested or by the legality of his arrest. *See United States ex rel. LaBelle v. LaVallee,* 517 F.2d 750, 755 (2d Cir.1975) (discovery of

---

3. To be sure, in the context of inventory searches, the Court has concluded that searching is reasonable only if performed according to standardized procedures. *See Bertine,* 479 U.S. at 374 n. 6, 107 S.Ct. at 742 n. 6; *Opperman,* 428 U.S. at 374–75, 96 S.Ct. at 3099–3100. In this connection, the *Bertine* Court also stated that the exercise of police discretion in the decision to impound a car could be constitutional if exercised according to standard criteria on the basis of something other than suspicion of criminal activity. *Bertine,* 479 U.S. at 375–76, 107 S.Ct. at 743. We express no opinion on whether *Bertine* requires that, where impoundment is used as a springboard for an inventory search, the decision to impound must be subject to set procedures. The need for standard procedures perceived by the *Bertine* Court is, after all, driven by the very nature of an inventory search; there, the police face strong temptations to go beyond administrative needs and rummage for investigatory purposes. Requiring a standardized procedure in such cases "tends to ensure that the intrusion [of the search is] limited in scope to the extent necessary to carry out the caretaking function." *Opperman,* 428 U.S. at 374–75, 96 S.Ct. at 3100. Limitation-of-scope considerations are, however, inapposite where the impoundment is not combined with, or for the purpose of effecting, an inventory search. A car is either impounded or it is not; there are no degrees. Put another way, in the cases involving standardized procedures, the challenged impoundment was followed by a search which was constitutional only by virtue of being incident to the impoundment. Since the case at hand involves no such search, but rather a police procedure (the canine sniff) which is not dependent on the impoundment for its constitutional validity, *see infra,* the impoundment itself is considerably less intrusive than an impoundment linked to an inventory search.

bloodstains by policeman who entered vehicle to check handbrake held to be legitimate regardless of lawfulness of vehicle owner's arrest; police officer was exercising community caretaking function), *cert. denied*, 423 U.S. 1062, 96 S.Ct. 803, 46 L.Ed.2d 655 (1976); *cf. New York v. Harris*, —— U.S. ——, 110 S.Ct. 1640, 1644–45, 109 L.Ed.2d 13 (1990) (statements made after warrantless arrest need not be suppressed merely because arrest was illegal).

### C. *What They Found.*

 Having established the legitimacy of the impoundment, our next step takes us to the constitutionality of the sniff test. In *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court analyzed canine sniffs in the context of luggage temporarily seized at an airport. The Court concluded that exposure of a person's luggage, located in a public place, to a trained drug-sniffing dog did not constitute a search. *Id.* at 706–07, 103 S.Ct. at 2644. The Court reasoned:

> A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less

discriminate and more intrusive investigative methods.

*Id.* at 707, 103 S.Ct. at 2644. The force and import of this language cannot seriously be questioned. After all, the Court later explored a parallel issue in *United States v. Jacobsen*, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984), holding that a chemical field test of a substance thought to be cocaine was not a search. The Court reasoned that because "Congress has decided ... to treat the interest in 'privately' possessing cocaine as illegitimate ... governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." *Id.* at 123, 104 S.Ct. at 1662 (footnote omitted). The *Jacobsen* Court stated that this result was "dictated" by *Place* and quoted much of the language from *Place* upon which we rely today. *See id.* 466 U.S. at 123–24, 104 S.Ct. at 1662. By characterizing the *Place* discussion as a holding to the effect that a canine sniff test is not a search, the *Jacobsen* Court firmly cemented *Place* into our fourth amendment jurisprudence.

We think *Place* applies full bore to the case at bar. The driver of a car on a public highway is considered to have a diminished expectation of privacy with regard to his vehicle. *See, e.g., California v. Carney*, 471 U.S. 386, 390–93, 105 S.Ct. 2066, 2070, 85 L.Ed.2d 406 (1985); *United States v. Panitz*, 907 F.2d 1267, 1271 (1st Cir.1990). Thus, there is no persuasive reason to apply the *ratio decidendi* of *Place* more grudgingly to canine sniffs performed on automobiles than to the smelling of luggage. We hold that the canine sniff of the exterior of a vehicle which is legitimately within the custody of the police is not a search within the meaning of the fourth amendment; and that subjecting the exterior of such a motor vehicle to the olfactory genius of a drug detection dog does not infringe upon the vehicle owner's fourth amendment rights.[4] *Accord United States*

---

4. The statement in *United States v. Quinn*, 815 F.2d 153, 159 (1st Cir.1987) that "[t]o be entitled to use a dog for purposes of making a sniff test, the officers were required merely to have had 'reasonable suspicion' that the car contained narcotics," is not contrary to our holding here.

In *Quinn*, the central issue involved the legality of temporarily detaining the object to be sniffed—a detention for which reasonable suspicion was required. The *Quinn* language, therefore, must be read in that context.

*v. Morales–Zamora,* 914 F.2d 200, 203 (10th Cir.1990) (where car lawfully detained by police, canine sniff not a search); *United States v. DiCesare,* 765 F.2d 890, 897, *amended,* 777 F.2d 543 (9th Cir.1985) (canine sniff of automobile trunk not a search); *cf. United States v. Vasquez,* 909 F.2d 235, 238 (7th Cir.1990) (sniff of private garage from public alley not a search); *United States v. Colyer,* 878 F.2d 469, 473–77 (D.C.Cir.1989) (sniff of Amtrak roomette from public area not a search); *see also United States v. Race,* 529 F.2d 12, 14 n. 2 (1st Cir.1976) ("We can discern no fourth amendment issue in the use of a dog for a routine check of ... freight in an airport warehouse.") (dictum). So long as the automobile is lawfully impounded, the canine sniff test can be performed without any showing of reasonable suspicion.

## III. TAIL'S END

The district court's finding that the state police had reasonable suspicion to stop the Toyota was not clearly erroneous. After the car had been lawfully stopped and the unavailability of any licensed driver revealed, the troopers' decision to remove the car to the state police barracks was a reasonable exercise of their community caretaking function, ergo, constitutionally defensible. The ensuing canine sniff around the vehicle's perimeter was not a search and did not implicate the fourth amendment. And upon receiving a positive indication that drugs were present, the authorities had probable cause to procure a warrant and carry out the thoroughgoing search of the automobile's interior which disclosed the cocaine cache.[5] Hence, the ultimate discovery of the contraband was lawful.

We need go no further. The court below erred in suppressing the evidence.

Reversed and remanded.

---

**5.** Rodriguez concedes, as indeed he must, that *once the dog alerted to the vehicle, the police had probable cause to obtain a search warrant. See, e.g., United States v. Quinn,* 815 F.2d 153, 159 (1st Cir.1987). In fact, the troopers did obtain one before searching the Toyota and discovering the cocaine.