931 F.2d 55
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Readie Van SMITH, Defendant-Appellant.
 No. 90-5199.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 11, 1991.
Decided April 23, 1991.
As Amended May 6, 1991.
 
 1
 Appeal from the United States District Court for the Western District of Virginia, at Roanoke. James H. Michael, Jr., District Judge. (CR-89-139)
 
 
 2
 Frederick T. Heblich, Jr., Parker, McElwain & Jacobs, P.C., Charlottesville, Va., for appellant.
 
 
 3
 Stephen Urban Baer, Assistant United States Attorney, Roanoke, Va., (Argued), for appellee. E. Montgomery Tucker, United States Attorney, Ray Burton Fitzgerald, Jr., Assistant United States Attorney, Roanoke, Va., on brief.
 
 
 4
 W.D.Va.
 
 
 5
 AFFIRMED.
 
 
 6
 Before WIDENER and CHAPMAN, Circuit Judges, and JOHN T. COPENHAVER, Jr., United States District Judge for the Southern District of West Virginia, sitting by designation.
 
 JOHN T. COPENHAVER, Jr., District Judge:
 
 7
 Readie Van Smith appeals from the order of the district court denying his motion to suppress evidence obtained by police officers in a warrantless search of his residence. The district judge denied Smith's motion to suppress and found that the evidence retrieved was admissible at trial on the basis of the exigent circumstances exception to the rule against warrantless searches. We agree and affirm the decision of the district court.
 
 I.
 
 8
 Appellant Readie Van Smith was indicted on October 19, 1989, by a grand jury in the United States District Court for the Western District of Virginia on charges of possession of cocaine with the intent to distribute, 21 U.S.C. Sec. 841(a), and use of a firearm in the commission of a drug offense, 18 U.S.C. Sec. 924(c). Prior to trial, the district judge denied Smith's motion to suppress evidence which had been obtained during a warrantless search of his residence at the time of arrest.[1] After a trial to a jury on January 10, 1990, Smith was convicted on both counts of the indictment. The sole issue raised in this appeal is whether the district court erred in denying Smith's pretrial motion to suppress.
 
 II.
 
 9
 At approximately 3:00 p.m. on September 30, 1989, the emergency operations center of the Charlottesville Police Department received a telephone report of "shots fired" in the vicinity of 2111 Michie Drive in the Hearthwood apartment complex. Three police officers were dispatched to the scene: Ronald E. Stayments, William Duncan and Karl Sprouse.
 
 
 10
 Officer Stayments was the first officer to arrive at the apartment complex. Because no specific location had been provided by the dispatch operator, Stayments circled the complex twice in his marked police vehicle before being flagged down by an unidentified woman who pointed to Apartment 73 and stated "that's where the shots were fired."
 
 
 11
 After parking his vehicle, Officer Stayments approached Apartment 73, finding that its door was standing approximately one-half open. Because he "had no idea what was going on," Stayments waited for a back-up officer to arrive before going into the apartment. Upon arrival of the back-up, Officer Duncan, Stayments stuck his head inside the door and called out, asking if anyone was home. After receiving no reply, Stayments proceeded into the apartment while Duncan kept watch on the outside.
 
 
 12
 Stayments conducted a cursory examination of the living area and was ascending the stairway to the second floor when he was informed by Officer Duncan that a black male, appellant Smith, was approaching the apartment. Upon Smith's entry, Stayments questioned him briefly as to who he was and what he was doing there and, after exiting the apartment for further discussion, was told by Smith that "guys" were shooting at him and trying to kill him and that he had shot back at them. Stayments also questioned Smith concerning the location of his gun but Smith either replied that he did not have it or did not know where it was.
 
 
 13
 During their discussion, Officer Stayments noted a large bulge in Smith's pocket and conducted a pat down in order to ascertain whether Smith was armed. Smith then willingly pulled out a bag of money from his trouser pocket which he claimed was from "Social Security." The bag of money retrieved from Smith was sorted out in $100 increments and was ultimately determined to contain $3,846. While in the process of retrieving additional money from his front pocket, Smith dropped a plastic bag from his pocket containing "two little white chunks of what appeared to be crack." Smith denied that the plastic bag was his and claimed that he did not know what it was or where it had come from. The plastic bag which fell from Smith's pocket proved to contain approximately eight grams of "crack" cocaine.
 
 
 14
 Smith was then read his rights and placed under arrest. While Officer Stayments was walking Smith to the police van and prior to their departure from the complex, Officer Sprouse asked whether he should "secure the apartment and shut the door." Stayments replied that the upstairs had not yet been checked and that they had "better check it." Officer Sprouse testified at the suppression hearing that this meant that he was "to make sure there wasn't a body up there and the gun," given that the whereabouts of Smith's weapon had not yet been determined and given that the officers were not yet "quite sure what the whole deal surrounding the shooting was." Sprouse also testified that he was specifically concerned, among other things, with the possibility of another gunman being upstairs in the apartment.
 
 
 15
 Sprouse entered the apartment, with his service revolver drawn, and proceeded upstairs. As he topped the stairs, Sprouse testified that he could see two bedrooms and a folding-type attic door. Sprouse noted that the attic door was standing open approximately 6-8 inches and that pink insulation was lying on the carpet underneath the opening. Thinking that "possibly someone was up there," Sprouse jerked the door open, following which a gun and a black plastic case fell out onto the carpet.[2] After checking the attic, Sprouse completed a cursory search of the upstairs by glancing quickly into each of the upstairs bedrooms. He then returned to the police station with the gun and case.[3]
 
 
 16
 Based upon the information received, the officers then secured a search warrant for Smith's apartment. When the warrant was served and the apartment searched, additional ammunition was found along with several test tubes containing cocaine residue.
 
 
 17
 Smith contends that the initial warrantless search of his apartment was per se improper and that it was not justified under exigency exceptions to the presumptive invalidity of such searches. He argues, therefore, that the district court erred in denying his motion to suppress the items retrieved from the attic during Officer Sprouse's warrantless search.
 
 III.
 
 18
 It is a basic tenant of the search and seizure doctrine that searches undertaken without a warrant issued upon probable cause are "per se unreasonable under the Fourth Amendment--subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967). One such exception is that of exigent circumstances. United States v. Turner, 650 F.2d 526, 528 (4th Cir.1981).
 
 
 19
 In determining the existence of exigent circumstances, courts have held that warrantless intrusions may be justified by hot pursuit of a fleeing felon, Welsh v. Wisconsin, 466 U.S. 740 (1984), imminent destruction of evidence, United States v. Turner, 650 F.2d 526, 528 (4th Cir.1981), the need to prevent a suspect's escape, Minnesota v. Olson, --- U.S. ----, 110 S.Ct. 1684, 1690 (1990), or the risk of danger to the police or to other persons inside or outside a dwelling. Id. at 1690. See also United States v. Clement, 854 F.2d 1116 (8th Cir.1988) ("It is not necessary to obtain a warrant if lives are threatened, a suspect's escape is imminent, or evidence is about to be destroyed"), citing Michigan v. Tyler, 436 U.S. 499, 509 (1978); Warden v. Hayden, 387 U.S. 294, 298-99 (1967); Ker v. California, 374 U.S. 23, 42 (1963).
 
 
 20
 In Maryland v. Buie, the Supreme Court recently considered the extent to which, under the exigency exception to the rule against warrantless searches, police officers may conduct a "protective sweep" of an arrestee's residence at the time of arrest. 110 S.Ct. 1093 (1990). In Buie, the Court held that, as an incident to an in-home arrest, officers could, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." Id. at 1098. Beyond that, the Court concluded the Fourth Amendment would permit a further protective sweep only "if the searching officer 'possesse[d] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[ed]' the officer in believing ... that the area swept harbored an individual posing a danger to the officer or others." Id. at 1095 (citations omitted).[4]
 
 
 21
 Noting that a protective sweep is a "quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others," the Buie Court held that the search must be narrowly confined to a cursory visual inspection of those places in which a person might be hiding. Id. at 1094. Furthermore, the sweep must last "no longer than necessary to dispel the reasonable suspicion of danger" and must not, in any event, last "longer than it takes to complete the arrest and depart the premises." Id. at 1099.
 
 
 22
 Consistent with the scope of and limitations placed upon protective sweep searches set forth in Buie and Olson, this circuit has upheld such searches where necessary to protect the safety of the arresting officers or to prevent the destruction of evidence. See, e.g., Giancola v. State of West Virginia Dep't of Pub. Safety, 830 F.2d 547 (4th Cir.1987); United States v. Bernard, 757 F.2d 1439 (4th Cir.1985); United States v. Turner, 650 F.2d 526 (4th Cir.1981); United States v. Baker, 577 F.2d 1147 (4th Cir.1978).
 
 
 23
 The factual circumstances leading to the arrest of Smith and the protective sweep of the apartment in this case are essentially undisputed. Reviewing these facts in the sequence in which they became known to the officers, we find that the protective sweep of the apartment was justified by a reasonable belief that the apartment may have harbored individuals who could pose a threat to the safety of the officers or others. Specifically, the officers were dispatched to the Hearthwood apartment complex because of a report of "shots fired." Upon arrival, Officer Stayments was specifically directed to Apartment 73 by a female bystander who informed him "that's where the shots were fired." Following a cursory visual inspection of the living area of the apartment, but prior to his being able to check the upstairs for the person or persons who might have originated the gunfire, Stayments was advised that appellant Smith was approaching the apartment from the outside.
 
 
 24
 After being instructed to step outside the apartment, Smith informed Stayments that "guys" had been shooting at him, were "trying to kill him," and that he had shot back at them. Despite questioning by Stayments, Smith did not inform the officer of the whereabouts of his weapon.
 
 
 25
 Based upon the "shots fired" call, the female bystander's specific reference to Apartment 73 as the location at which the shots were fired, and the defendant's own report of exchanging gunfire with "guys" who were trying to kill him, coupled with the seizure of crack cocaine and a large amount of cash from Smith, the officers had a rational basis upon which to believe that one or more individuals bearing dangerous weapons and posing a risk to the officers could be in the immediate vicinity of the arrest. Indeed, inasmuch as the door to the apartment was standing open at the time of the officers' arrival, and inasmuch as Smith approached the apartment from the outside, the officers could have rationally inferred that the other gunmen with whom Smith claimed to have exchanged gunfire could have entered the apartment while he was on the outside and were waiting to fire on him or the officers as they departed the scene. See United States v. Rosado, 866 F.2d 967, 970 (7th Cir.1989). A cursory visual examination of the second level of the apartment overlooking the parking area was, therefore, justified in order to dispel the possibility of such an attack upon Smith and the officers as they undertook to depart from the scene.
 
 
 26
 Moreover, inasmuch as Stayments had been advised by the defendant that Apartment 73 belonged to his aunt with whom he had been living, and inasmuch as the aunt's whereabouts had not been ascertained at the time of the defendant's arrest, the officers could reasonably have been concerned not only for their own safety but for the safety of third parties who might have been present inside the apartment at the time of the arrest. See Minnesota v. Olson, 110 S.Ct. at 1690 (warrantless intrusion may be justified by the need to prevent risk of danger to the police or "to persons inside or outside the dwelling").
 
 
 27
 In view of the facts which were known to the officers at the time of Smith's arrest, the protective sweep of the apartment was not inconsistent with the principles articulated in Buie nor in any of our prior decisions concerning the propriety and permissible scope of such searches. As required by Buie, a review of "specific and articulable" facts known to the officers at the time of the arrest, in conjunction with rational inferences drawn from those facts, reasonably warranted the arresting officers' belief that a protective sweep of the apartment was necessary in order to rule out the possibility of danger to themselves or to others. 110 S.Ct. at 1095.
 
 
 28
 We likewise conclude that the scope of the officer's protective sweep of the apartment did not go beyond that permitted by Buie.[5] The protective sweep was confined to areas in which a gunman or victim could be harbored, and lasted no longer than was necessary in order to dispel the officers' reasonable suspicion of danger.[6]
 
 
 29
 Inasmuch as the protective sweep was undertaken on the basis of the officers' reasonable belief that the area swept potentially harbored a gunman or gunmen who could threaten their safety or the safety of others at the scene, and inasmuch as the sweep did not exceed the permissible bounds of such searches as defined by Buie, the warrantless search of Smith's residence was justifiable as a matter of law under the exigency exception to the general rule against warrantless searches. Buie, 110 S.Ct. 1093; see also United States v. Delgado, 903 F.2d 1495 (11th Cir.1990). In the course of that protective sweep, the officers had the right to seize any evidence of crime in plain view. See United States v. Bernard, 757 F.2d 1439 (1985); United States v. Baker, 577 F.2d 1147, 1152 (4th Cir.1978). Accordingly, the district court did not err when it denied Smith's motion to suppress and its order is
 
 
 30
 AFFIRMED.
 
 
 31
 WIDENER and CHAPMAN, Circuit Judges, joined.
 
 
 
 [1]
 Smith was initially arrested on September 30, 1989, by Charlottesville, Virginia, police officers on charges of possession of cocaine with intent to distribute under Virginia Code Sec. 18.2-248, and unlawful discharge of a firearm within city limits, Virginia Code Section 18.2-280. The state drug charge was dismissed following Smith's indictment on federal charges. A thirty-day jail sentence on the state firearm charge was suspended
 
 
 [2]
 The weapon was a Beretta 92F semiautomatic. There was a live round in the chamber and twelve others in the magazine. An additional magazine in the case contained fifteen more rounds. The gun smelled as though it had recently been fired
 
 
 [3]
 When the defendant saw the 9mm Beretta upon Sprouse's return to the station, he identified the gun as his and stated that he wanted it back
 
 
 [4]
 Although Buie concerned a protective sweep incident to an inhome arrest, a protective sweep of an arrestee's residence may also be justified by exigent circumstances in cases such as this where the arrest itself occurred outside the premises. See United States v. Hoyos, 892 F.2d 1387 (9th Cir.1989), in which the Ninth Circuit noted:
 Hoyos' contention that the protective sweep exception to the requirement of a search warrant to enter a residence does not apply if the arrest occurs outside is not supported by any authority. This is not surprising because the distinction is logically unsound. If the exigencies to support a protective sweep exist, whether the arrest occurred inside or outside the residence does not affect the reasonableness of the officer's conduct. A bullet fired at an arresting officer standing outside a window is as deadly as one that is projected from one room to another....
 Id. at 1397 (emphasis in original).
 
 
 [5]
 The district judge noted the following factual recount of the limited intrusiveness of the search:
 Both officers remained in the apartment for only a short period of time. Neither officer rummaged around the apartment in an effort to turn up additional evidence. Officer Sprouse, upon seeing the partially open attic door, which could have indicated that someone, including a potential gunman, was hiding there, or as it turned out, that a dangerous instrumentality had been concealed there, did no more than retrieve the weapon which fell out. After assuring themselves that no victims of a shooting were located in the apartment and that nothing in the unit posed further danger to the public, the officers secured the unit and proceeded to obtain a search warrant.
 We conclude that these factual findings concerning the propriety and scope of the search were not clearly erroneous. United States v. Bernard, 757 F.2d 1439 (4th Cir.1985); United States v. Turner, 650 F.2d 526 (4th Cir.1981).
 
 
 [6]
 Although Smith argues that the arrest had been completed and he had been taken from the scene prior to the protective sweep, the record of the suppression hearing does not support this conclusion. Officer Stayments' testimony merely reflects that he did not go back into the apartment after arresting Smith but that he "read him his rights, placed him under arrest ... put him in the van and ... went to Base." Stayments was not specifically asked where he and the defendant were located at the time he directed Officer Sprouse to conduct the protective sweep
 Officer Sprouse testified that he was told to conduct the protective sweep when Officer Stayments was "getting ready to leave the scene." Officer Stayments' concern for the officers' safety and the safety of third parties possibly being held inside the apartment would have been no loss merely because he was preparing to leave the scene with the defendant. See United States v. Baker, wherein this court upheld a protective sweep given the possibility that "there might be an armed accomplice in the house who observing the arrest ... would fire on them." 577 F.2d 1147, 1152.