947 F.2d 942
 34 Fed. R. Evid. Serv. 403
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Baynus Millner HAIRSTON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Dwayne Ramon SMITH, Defendant-Appellant.
 Nos. 89-5763, 90-5459.
 United States Court of Appeals, Fourth Circuit.
 Argued Jan. 10, 1991.
Decided Oct. 25, 1991.
 
 1
 Appeals from the United States District Court for the Middle District of North Carolina, at Greensboro. Hiram H. Ward, Senior District Judge. (CR-89-105-G)
 
 
 2
 Argued: David Ferris Tamer, Winston-Salem, N.C., for appellants; Robert Holt Edmunds, Jr., United States Attorney, Greensboro, N.C., for appellee.
 
 
 3
 On Brief: Lonnie G. Albright, III, Pfaff, Elmore & Albright, Susan Hayes, Greensboro, N.C., for appellants.
 
 
 4
 M.D.N.C.
 
 
 5
 AFFIRMED.
 
 
 6
 Before WIDENER and K.K. HALL, Circuit Judges, and THOMAS SELBY ELLIS, III, United States District Judge for the Eastern District of Virginia, sitting by designation.
 
 OPINION
 THOMAS SELBY ELLIS, III, District Judge:
 
 7
 On September 1, 1989, after a jury trial in the United States District Court for the Middle District of North Carolina, Defendant Baynus Miller Hairston was convicted of conspiring to possess with the intent to distribute and to distribute cocaine. For this crime, Hairston was sentenced to seven years and three months imprisonment. He now appeals his conviction, arguing that the district court abused its discretion when it permitted a co-conspirator turned government witness to testify about a statement allegedly made by Hairston.
 
 
 8
 Prior to Hairston's trial, co-conspirator Dwayne Ramon Smith entered a plea of guilty to the same charge for which Hairston was convicted. Smith also pled guilty to the charge of attempting to possess with the intent to distribute approximately one kilogram of cocaine. Finally, Smith waived his right to a jury trial on the additional charge of carrying and using a firearm during and in relation to the crimes to which he pled guilty. Thereafter, the district judge heard the evidence against Smith with respect to the firearm charge, made findings of fact, and found Smith guilty. Smith received a sentence of seven years and three months imprisonment for the crimes to which he pled guilty, and an additional five years imprisonment for the firearm violation, as mandated by 18 U.S.C. § 924(c)(1). Smith now appeals his firearm conviction, arguing that there was insufficient evidence to establish the violation beyond a reasonable doubt. Smith also contends that the district court erroneously concluded that Smith was a manager or supervisor when sentencing him for the crimes to which he pled guilty. Finding no merit in the contentions of either defendant, we affirm.
 
 
 9
 * According to the trial testimony of two co-conspirators turned government witnesses, John Jeffries and Michael Johnson, a conspiracy to transport cocaine from New York City to Greensboro, North Carolina for distribution and sale began in March 1989. At that time, Johnson flew to New York to obtain cocaine for distribution by Jeffries to Jeffries' friends. Once in New York, Johnson met defendant Smith, who supplied Johnson with a kilogram of cocaine and returned with him to Greensboro. On March 22, 1989, Smith and Johnson visited Jeffries at his Greensboro apartment, where they weighed the cocaine and sold Jeffries one ounce for distribution. The following Wednesday, March 24, 1989, Jeffries attempted to purchase more cocaine from Johnson. Johnson had none left. He therefore gave Jeffries defendant Smith's beeper number. Jeffries called Smith, who said that no cocaine was available and that he was trying to get more. Over the next few days, Smith gave Jeffries the telephone numbers for both Smith's car phone and Smith's room at the Greensboro Sheraton.
 
 
 10
 A shipment of cocaine arrived in Greensboro the following Monday. On that day, Jeffries called Smith at the Sheraton to learn whether more cocaine had arrived. Smith invited Jeffries to come to his hotel room. There, Jeffries met co-conspirator Jamal Mention. In Smith's hotel room, Jeffries saw remote telephones plugged in and recharging, several beepers lying in plain view, and a calculator on which telephone numbers could be stored and replayed into a telephone.[1] Smith informed Jeffries that he was unhappy with Johnson's handling of money received from cocaine sales and asked Jeffries to handle the finances. Smith and Jeffries then went to the airport and met a courier from New York, Eric Wallace. Smith, Jeffries, and Wallace subsequently drove to Jeffries' apartment where the cocaine was weighed and Jeffries kept seven ounces to sell. Another delivery at the Greensboro airport took place on April 1, 1989. Wallace and another individual, Paul Dupree, acted as couriers, and Smith instructed Jeffries on how to divide the cocaine.
 
 
 11
 A final attempted delivery took place on April 3-4, 1989. Jeffries met Wallace and Dupree at the airport in Greensboro and drove them to his apartment. On the way, local police and FBI agents stopped the car, found cocaine in luggage in the trunk, and arrested all three men. Jeffries agreed to cooperate with the authorities and to represent to other co-conspirators that the cocaine had arrived without incident. As it happened, however, one co-conspirator, Johnson, had already observed Wallace and Dupree inside police headquarters and had noted Jeffries' car parked outside. Johnson met immediately with Smith. Also present were defendant Baynus Hairston and an individual named Irving Smith. Johnson, within the hearing of Hairston, informed Smith about what he had seen. Smith thereafter had conversations with Hairston that Johnson did not hear.
 
 
 12
 The following morning, Hairston drove Johnson to see Smith, who had spent the night at a friend's apartment. Johnson called Jeffries' apartment. Jeffries informed him that Wallace and Dupree were at a hotel. Johnson knew this to be untrue, as he had observed them at the police station, and so informed Smith. Nonetheless, Smith, Hairston, Johnson, Mention, and Irving Smith drove to Jeffries' apartment in Hairston's gold Lincoln Continental. According to Smith's own testimony, he brought his .45 caliber pistol with him, wrapped in his sweater, and placed it beside himself on the back seat of Hairston's car. Smith further testified that he brought the pistol because he did not want to leave it at his friend's apartment or in his own car, not because he anticipated using it upon arrival at Jeffries' apartment. However, Johnson testified that upon reaching Jeffries' apartment, he heard the sound of a gun being cocked and, turning around, saw Hairston placing Smith's pistol under his belt.
 
 
 13
 Smith, Hairston, Johnson and Mention entered Jeffries' apartment. Under questioning, Jeffries told Smith that Wallace and Dupree had the cocaine and were staying in High Point. Jeffries testified that when Hairston heard this, he turned to Smith and said: "We'll just get our half and leave." The group then left Jeffries and went to Johnson's house.
 
 
 14
 Smith and Hairston proceeded to High Point, driving Smith's Mercedes, while Johnson accompanied them driving Hairston's gold Lincoln Continental. They, of course, did not find Wallace or Dupree in High Point. The trio therefore returned to Jeffries' apartment. Johnson continued to drive Hairston's gold Lincoln Continental, while Smith and Hairston followed in Smith's Mercedes. Greensboro police and FBI agents, who had staked out Jeffries' apartment, observed the two cars drive by several times over the course of approximately one hour and then park nearby. Smith walked to the apartment and met Jeffries, who told him that the cocaine was in Jeffries' car parked outside. As the two walked to Jeffries' car, the police arrested them. Johnson was also arrested nearby. Hairston was arrested while still sitting in the driver's seat of Smith's Mercedes. Police found a pouch in the Mercedes beside the driver's seat containing Smith's semi-automatic .45 caliber pistol. Police later found a box of .45 caliber ammunition in the Mercedes' glove compartment.
 
 
 15
 At Smith's separate bench trial on the firearm charge, Smith stipulated (i) that the .45 caliber pistol belonged to him, (ii) that the district court judge could consider Johnson's testimony given at Hairston's trial provided that Johnson was available for cross-examination, (iii) that the Mercedes was in Smith's possession and control, and (iv) that the pistol functioned properly when tested by agents. Evidence was also offered indicating that Smith and Johnson had $8,000 dollars invested in the cocaine delivery intercepted by the police and FBI, that Johnson feared a set-up involving Jeffries, and that he had so warned Smith. Smith testified that after leaving Jeffries' apartment the first time on the day of his arrest he remembered seeing the gun lying on his sweater in the back of Hairston's Continental, and that he did not know how the gun ended up in his Mercedes.
 
 
 16
 The district court judge found that Smith had placed the pistol in Hairston's Continental himself, that Hairston had carried the pistol into Jeffries' apartment, and that either Hairston or Smith had placed the pistol in Smith's Mercedes during the trip to High Point in search of the couriers and the cocaine. He concluded that this use of the pistol facilitated a violation of the narcotics laws.
 
 II
 
 17
 At trial, Jeffries testified that he overheard Hairston say, "We'll just get our half and leave." Hairston contends that the admission was unfairly prejudicial and should have been excluded pursuant to Rule 403, Fed.R.Evid. Pursuant to Rule 403, relevant evidence may nonetheless "be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." The "question of whether the probative value of the testimony is disproportionately prejudicial to the defendant ... is one committed to the discretion of the district court and its discretion will only be disturbed if it acted 'arbitrarily or irrationally.' " United States v. Masters, 622 F.2d 83, 87-88 (4th Cir.1980), quoting United States v. Robinson, 560 F.2d 507, 515 (2d Cir.1977), cert. denied, 435 U.S. 905 (1978); accord United States v. Simpson, 910 F.2d 154, 157 (4th Cir.1990). Moreover, Rule 403
 
 
 18
 does not offer protection against evidence that is merely prejudicial in the sense of being detrimental to a party's case. The rule protects against evidence that is unfairly prejudicial, that is, if it tends to suggest decision on an improper basis.
 
 
 19
 Wade v. Haynes, 663 F.2d 778, 783 (8th Cir.1981) (emphasis added), cert. denied, 461 U.S. 30 (1983). Unfair prejudice means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Note, Fed.R.Evid. 403.
 
 
 20
 Here, defendant Hairston admits his statement, viewed in a light favorable to the government, could be interpreted to refer to drugs and to show his guilty knowledge. But Hairston contends that the phrase is ambiguous and that this ambiguity diminishes its probative value and rendered its admission prejudicial.[2] This contention is meritless.
 
 
 21
 Nothing about the statement appeals to improper emotions or prejudice. The inference that it refers to drugs is entirely warranted. Moreover, the statement was one of numerous pieces of evidence supporting the verdict against Hairston. These included, inter alia, Johnson's testimony that Hairston placed Smith's .45 caliber pistol under his belt before entering Jeffries' apartment, and the testimony of police that they observed Hairston and others circling Jeffries' apartment for approximately one hour before parking and visiting Jeffries a second time. Hence, we cannot conclude that the statement, taken by itself or together with other relevant evidence, "posed any real risk of unfair prejudice or confusion sufficient to outweigh [its] probative value." United States v. Vogt, 910 F.2d 1184, 1193 (4th Cir.1990). Its admission therefore was well within the district court's discretion.
 
 III
 
 22
 Defendant Dwayne Smith contends there was insufficient evidence to support his firearm conviction. A guilty verdict must be sustained "if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). The specific inquiry is "whether, viewing the evidence in the light most favorable to the government, any rational trier of facts could have found the defendant guilty beyond a reasonable doubt." United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982).
 
 
 23
 Smith was convicted of violating 18 U.S.C. § 924(c)(1), which provides in relevant part:
 
 
 24
 Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....
 
 
 25
 Id. The word "carries" as used in the statute is not to be given a "hypertechnical or narrow reading" and "includes transportation or causing to be transported." United States v. Barber, 594 F.2d 1242, 1244 (8th Cir.1979). A firearm may be used or carried in relation to a crime without actually being displayed or brandished during the crime's commission. See United States v. Rosado, 866 F.2d 967 (7th Cir.1989). As then-Judge Kennedy noted in United States v. Stewart, 779 F.2d 538 (9th Cir.), cert. denied, --- U.S. ---- 108 S.Ct. 192 (1987):
 
 
 26
 If the firearm is within the possession or control of a person who commits an underlying offense as defined by the statute, and the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity or ability to display or discharge the weapon whether or not such display or discharge in fact occurred, then there is a violation of the statute.
 
 
 27
 Id. at 540.
 
 
 28
 Here, there is ample evidence from which a rational trier of fact could conclude that Smith was guilty beyond a reasonable doubt. Smith stipulated that the .45 caliber pistol belonged to him. The testimony of Johnson was that Smith and Johnson suspected a set-up on the morning they drove to Jeffries' apartment. Smith testified that he himself wrapped the pistol in his sweater that morning and placed it on the back seat of Hairston's Continental, between himself and Hairston, while Johnson drove the Continental to Jeffries' apartment.[3] Johnson testified that as he parked the Continental at Jeffries' apartment, he heard the cocking of a gun and looked around to see Hairston placing the pistol under his belt. Hairston then entered Jeffries' apartment. Moreover, at some point during the subsequent futile trip to High Point in search of the drug couriers and cocaine, the pistol was transferred to Smith's Mercedes, in which Smith and Hairston were traveling. The district judge found that the pistol was carried in the Mercedes by both Smith and Hairston on the trip to High Point. This use, as well as Smith's placing the gun in Hairston's car during the first trip to Jeffries' apartment and Hairston's carrying the gun under his belt into the apartment were all found to facilitate violation of federal narcotics laws.
 
 
 29
 Smith, in opposition, relies on United States v. Bernal, 719 F.2d 1475 (9th Cir.1983), where the Ninth Circuit held that merely finding a firearm in a vehicle occupied by the defendant and other persons was insufficient to establish that the defendant owned or possessed the gun. Yet Bernal is distinguishable. Its focus was not, as here, the statutory requirement that the firearm be used or carried in the commission of a drug trafficking crime. Instead, Bernal focused on the requirement in § 924(c)'s predecessor that the firearm possession be unlawful under state law.[4] The court held that the facts there presented were insufficient under Nevada law to prove possession and hence unlawful possession was not proved. Here, by contrast, there was an abundance of evidence establishing possession. Smith stipulated that the gun was his and testified that he placed it in Hairston's Lincoln Continental on the day of his arrest. As noted above, there also was substantial additional evidence linking Smith to the use of the pistol during the commission of a drug trafficking crime. In sum, there was substantial evidence from which a rational trier of fact could conclude beyond reasonable doubt that Smith used or carried the firearm in relation to a drug trafficking crime.
 
 IV
 
 30
 Smith's second contention is that the district court erred in concluding that Smith was a "manager or supervisor" under § 3B1.1(b) of the United States Sentencing Guidelines, thus meriting an offense-level enhancement. Such an enhancement is to be given to a manager or supervisor of "criminal activity involv[ing] five or more participants" or that is "otherwise extensive." U.S.S.G. § 3B1.1(b).
 
 
 31
 We begin by noting that "[a]ppellate review of a sentence imposed under the Guidelines is limited to a determination of whether it is either 'in violation of law ... or ... [the] result of an incorrect application of the sentencing guidelines.' " United States v. Sheffer, 896 F.2d 842, 844 (4th Cir.1990), quoting 18 U.S.C. § 3742(e). "During sentencing, the district court's determination should be based upon a preponderance of the evidence." Id. Here there was abundant evidence to support the district court's determination concerning Smith's supervisory role, including evidence that at least five people were engaged in the transportation, distribution and sale of cocaine. We therefore find no error in the district court's determination that Smith merited an enhancement to account for his supervisory role in the offense.
 
 
 32
 For the reasons stated herein, the decisions of the court below are
 
 
 33
 AFFIRMED.
 
 
 34
 WIDENER and K.K. HALL, Circuit Judges, joined.
 
 
 
 [1]
 Photographs alleged to show Smith and Mention in this hotel room were admitted into evidence at trial
 
 
 [2]
 Hairston also argues that Jeffries' testimony concerning the statement was contradicted by Johnson's testimony, and that this also lessened its probative value. This distorts Johnson's testimony, which indicated merely that Johnson had entered Jeffries' apartment only briefly and could not recall overhearing Hairston make any statements at all
 
 
 [3]
 Smith testified that he brought the gun because he did not like leaving it unattended and therefore did not wish to leave it at his friend's apartment or in his own Mercedes. This testimony may have been weakened by Smith's later testimony that, upon arriving at Jeffries' apartment, he left the gun on the back seat of Hairston's Continental and did not know how the gun was transferred to Smith's Mercedes, where it was found by the police
 
 
 [4]
 The requirement of showing unlawful possession in addition to showing the use or carrying of a firearm during the commission of particular federal crimes was mandated by the predecessor of current § 924(c) and was eliminated by 1984 amendments to § 924(c). See Comprehensive Crime Control Act of 1984, Pub.L. 98-473, §§ 223(a), 1005(a), 1984 U.S.Code Congressional and Administrative News (98 Stat.) 2028, 2138 (1984); S.Rep. No. 98-225 at 314 n. 10, reprinted in 1984 U.S.Code Congressional and Administrative News 3182, 3492 n. 10