UNITED STATES of America,

v.

**Scott M. HOGAN, Defendant.**

**No. 99–CR–004 (TCP).**

United States District Court,
E.D. New York.

Sept. 20, 2000.

Burton Ryan, Jr., United States Attorney's Office Criminal Division, Garden City, NY, for U.S.

Lawrence V. Carra, Mineola, NY, for Defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

On July 24, 2000; Magistrate Judge Viktor V. Pohorelsky recommended that this Court take the following actions: 1) deny defendant's motions to suppress wiretap evidence; 2) deny defendant's motion to suppress evidence obtained from a search of 406 South 9th Street, Lindenhurst, New York; and 3) grant defendant's motion to suppress evidence obtained from a warrantless search of a briefcase seized from a locked trunk of a rented car.

The United States has not objected to the Report and Recommendation ("Report"). However, Scott Hogan, the defendant, asserted three objections. Hogan maintains that the wiretap applications in this case failed to show sufficiently that normal investigative means had been tried or were unlikely to be successful if tried. Hogan also contends that evidence from the search of 406 South 9th Street should be suppressed because the house is a private dwelling. Furthermore, Hogan asserts that the good faith exception to the warrant preference rule does not apply.

In the Report, Magistrate Judge Pohorelsky thoroughly addressed the traditional investigative methods used by the Nassau County Police Department in this case. Judge Pohorelsky also detailed the reasons why traditional methods would only prove marginally effective during this particular investigation. The Court accepts this evidence.

▆▆▆ Hogan contends that the wiretap evidence should be suppressed because normal investigative techniques would have been sufficient. He notes that detectives had successfully followed Hogan for fourteen hours. Hogan also asserts that police failed to use the normal investigative technique of conventional surveillance. The statutory requirements of 18 U.S.C. § 2518 do not require police to exhaust all traditional methods of investigation before seeking a warrant. *See United States v. Diaz*, 176 F.3d 52, 111 (2d Cir.1999). The purpose of section 2518 is merely to "require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement." *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.1976). The detectives of the Nassau County Police met this burden by showing that traditional methods would not provide sufficient evidence. Therefore, this objection is rejected.

▆▆▆ Hogan also objects that the house on 406 South 9th Street was a private dwelling and therefore protected against a warrantless dog sniff. Even assuming that the house is a dwelling, the

officers were still entitled to enter the driveway and the perimeter of the house to conduct a dog sniff. Neither the driveway nor the area surrounding the house was part of the curtilage of the house. The curtilage extends only to those areas which harbor "intimate activities associated with domestic life and the privacies of the home." *United States v. Dunn,* 480 U.S. 294, 301 n. 4, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). The Supreme Court set forth four factors to consider when determining whether an area should be included in the curtilage. These factors include "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing through." *Id.* at 301, 107 S.Ct. 1134. The key to a determination of the boundaries of a curtilage is whether the defendant had a reasonable expectation of privacy in the disputed area. *United States v. Reilly,* 76 F.3d 1271, 1276 (2d Cir.1996).

Here, the perimeter of the house is clearly in close proximity to the house itself. However, the front of the house not was enclosed, obscured from the view, or used for any purpose other than for entrance or egress. The dilapidated stockade fence on the property did not enclose the front of the house. It merely extended from the side of the house and ran through the area behind the house. Most importantly, Hogan did not have a reasonable expectation of privacy in any part of the perimeter of the house. Hogan has not shown that he occupied the house or engaged in "intimate activities associated with domestic life" around the perimeter of 406 South 9th Street. Therefore, the police were entitled to approach the house. Furthermore, even if the curtilage extended to the areas in the rear of the house, this Court adopts the Report's recommendation that evidence garnered from the front of the house was sufficient to support a warrant.

■ Magistrate Judge Pohorelsky thoroughly addressed the issue of the resulting dog sniff in his Report, and this Court adopts the Judge's reasoning and conclusions. This Court also adopts Judge Pohorelsky's recommendation that, if necessary, the good faith exception to the warrant requirement would apply to this case. Hogan objects that the affidavit in support of a search warrant failed to label the dog sniff as a warrantless search. However, omitting this detail does not amount to a "knowing or reckless falsity on the affidavit" because of a failure to present "clearly critical" facts to the issuing judge. *Reilly,* 76 F.3d at 1280. The affidavit sets forth the history of the investigation, clearly noting activities conducted pursuant to warrants. The affidavit also described in detail the dog sniff at 406 South 9th Street. Therefore, Honorable Donald E. Belfi, who issued the warrant, was given sufficient information to assess the merit of the application, and the good faith exception would apply here. *See id.*

Accordingly, on the basis of and for the reasons set forth therein, Magistrate Judge Pohorelsky's Report and Recommendation must be, and the same hereby is, AFFIRMED in all respects and ADOPTED as an Order of this Court.

SO ORDERED.

## REPORT AND RECOMMENDATION

POHORELSKY, United States Magistrate Judge.

Pending before the court are three motions made by the defendant Scott M. Hogan which were referred to the undersigned by Judge Platt for a hearing. The three motions seek to suppress evidence obtained (a) through electronic surveillance of pager information and telephone conversations, (b) from the execution of a search warrant at 406 South 9th Street, Lindenhurst, New York, and (c) from the warrantless seizure of a briefcase from the

locked trunk of a rented automobile. A factual hearing, followed by oral argument, was held on May 15 and 16, 2000. On the basis of that hearing and all of the papers submitted in connection with the motions, the court makes the following report and recommendation.

## I. BACKGROUND

The indictment in this case charges the defendant with various narcotics offenses based on his alleged involvement in the wholesale distribution of tons of marijuana in the Long Island area over a number of years. The investigation that yielded the indictment commenced in 1996 when detectives of the Nassau County Police Department ("NCPD") began to pursue leads concerning the defendant received from various confidential informants. As part of the investigation they obtained several electronic eavesdropping warrants from New York state courts, as well as a search warrant for premises owned by the defendant at 406 South 9th Street in Lindenhurst, New York. In May 1997, the defendant was arrested on state charges, and in July 1997 a state grand jury indicted him on various narcotics felonies. In the course of proceedings following that indictment, the defendant challenged the eavesdropping and search warrants in state court. His challenges were rejected in a decision and order entered by Honorable Jules Orenstein, County Court, Nassau County, on March 19, 1998.

Independent of the efforts of the NCPD, a task force organized by the United States Drug Enforcement Administration ("DEA") was conducting an investigation into marijuana trafficking on Long Island by career drug dealers. This Marijuana Task Force ("MTF") pooled the efforts of various federal and local law enforcement agencies including the NCPD, and yielded a broader picture of the defendant's activities in the light of evidence obtained from sources beyond those previously known by

the NCPD. As a result, with the consent of the NCPD and the Nassau County District Attorney, the defendant was indicted by a federal grand jury while the state indictment was still pending, and the state indictment has since been dismissed in favor of the federal prosecution.

The federal indictment charges the defendant with operating a continuing criminal enterprise from January 1982 to January 1999 which employed a number of other persons and which involved numerous sales of large quantities of marijuana. The indictment also contains related charges of conspiracy to distribute marijuana and conspiracy to commit money laundering, as well as a charge seeking criminal forfeiture of the proceeds of the defendant's criminal activities.

## II. ELECTRONIC SURVEILLANCE

The defendant challenges the various eavesdropping warrants obtained by the NCPD on the ground that the NCPD did not adequately establish the statutorily mandated prerequisite that less intrusive investigative procedures had failed or were unlikely to be successful if tried. The factual findings and discussion that follow address that contention.

### A. *Facts*

In the course of the investigation conducted by the NCPD before the MTF's involvement with the defendant, a series of electronic eavesdropping warrants were obtained to permit the NCPD to monitor various electronic communications of the defendant. The first warrant was obtained on August 2, 1996 and permitted the NCPD to intercept the electronic transmissions (primarily telephone numbers) made to a digital pager used by the defendant. GX 1(a).[1] That warrant was later amended in late August 1996 to permit the interception of voice mail messages to the pager, and was extended several

---

1. As used herein, "GX" refers to the exhibits introduced by the government at the hearing

on May 15 and 16, 2000; "Tr." refers to the transcript of the hearing.

times until it expired on January 27, 1997. GX 1(b) – 1(h). A second warrant was then obtained on January 29, 1997 permitting the interception of communications made on a cellular telephone and a residential telephone used by the defendant, and this warrant was extended several times until it expired on May 7, 1997. GX 1(i) –(m). Shortly before it expired, the latter warrant was also amended to add another cellular telephone used by the defendant. GX 1(m). Thus, in total, the NCPD obtained authorization to intercept electronic communications made to a pager and a pager voicemail, as well as communications to and from three different telephones.

Testimony at the factual hearing established that the investigation out of which the NCPD obtained the eavesdropping warrants was opened in May of 1996. Prior to obtaining the warrant the two lead detectives on the investigation, Jerome McCarthy and Paul Vitucci, had reviewed records of previous investigations and had debriefed a half dozen confidential informants who provided historical information about the defendant's narcotics trafficking activities. The detectives had been unable, however, to conduct surveillance on the defendant himself, because they had been unable to locate him. On a number of occasions they had conducted surveillance of two residences owned by his parents which they believed he frequented, but had not seen him. They had been unable to locate him through Department of Motor Vehicle records because he had no vehicles registered in his name. Efforts to use the confidential informants to establish contact with the defendant also proved fruitless as he would not deal with them. They were aware from a prior investigation that the defendant owned a house at 406 South 9th Street in Lindenhurst, New York which was believed to have been used as a "stash house," but they had not conducted surveillance at that location before obtaining the first eavesdropping warrant.

B. *Discussion*

Although the defendant's challenge to the electronic surveillance here is arguably governed by state law, because the warrants were obtained under the New York Criminal Procedure Law, the parties appear to agree that, at least as to this issue, state and federal law is identical. Moreover, the Second Circuit in *United States v. Lilla*, 699 F.2d 99, 102 (2d Cir.1983), has observed that the applicable statutes under state and federal law are virtually identical and that there is no appreciable difference in the case law. Accordingly, the discussion below is guided by Second Circuit precedent.

■■ To obtain a wiretapping warrant under both state and federal law, a showing must be made that normal investigative procedures have failed or reasonably appear to be unlikely to succeed if tried. *See* 18 U.S.C. § 2518; § N.Y.Crim.Proc.Law § 700.15. "Normal investigative procedure would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants." *United States v. Torres*, 901 F.2d 205, 231 (2d Cir.1990). As the Second Circuit has long observed, however, "the purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *United States v. Hinton*, 543 F.2d 1002, 1011 (2d Cir.), *cert. denied*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *accord, e.g., United States v. Diaz*, 176 F.3d 52 (2d Cir.1999); *United States v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir.1979). The wiretapping statute "is simply designed to as-

sure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 39 L.Ed.2d 225 (1974). Moreover, the role of an appeals court in reviewing the issuance of a wiretap order, "is not to make a de novo determination of sufficiency as if it were a district judge, but to decide if the facts set forth in the application were minimally adequate to support the determination that was made." *United States v. Torres*, 901 F.2d at 231 (*quoting United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.) (collecting cases), *cert. denied*, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977)); *accord United States v. Diaz*, 176 F.3d at 109. Thus, the issue of whether a normal investigative method has been exhausted "must be tested in a practical and common sense manner." *United States v. Diaz*, 176 F.3d at 111.

█ Viewed under those standards, the various wiretap applications in this case all make a sufficient showing that normal investigative means either had been tried or were unlikely to be successful if tried. Taking first the initial application for the interception of communications to the defendant's pager, the affiant detailed the investigative efforts that had been tried thus far, including review of police files and intelligence reports, debriefings of confidential informants, and reviews of telephone records and other subpoenaed documents. *See* Affidavit of Jerome McCarthy, August 1, 1996, at 5 (found in GX 1(a)). Those efforts had yielded no information about the defendant's current customers and subordinates, or the places where he stored narcotics or otherwise conducted his business operations. *Id.* at 9. The affiant also explained why traditional investigative techniques would not be successful in achieving the goals of the investigation, which were not merely the apprehension of the defendant, but the gathering of evidence beyond a reasonable doubt about his entire narcotics operation,

including his suppliers, customers and subordinates. Although surveillance of the defendant might supply some of that information, in view of the defendant's prior criminal history it was unlikely that such surveillance would long go undetected by the defendant. Once detected, the defendant was certain to alter his conduct to avoid surveillance. Similarly, search warrants were not viable options at that time because there were no known locations to search, and a search would in any event signal the existence of the investigation and likely drive the defendant further underground. Use of an undercover agent to infiltrate the organization was not an option because the police were unable to find a feasible way to introduce an agent into the defendant's operation. Further use of the principal informant would only yield further information about the one supplier of which the informant was aware, and thus would not assist in the identification and prosecution of the defendant's other coconspirators. *Id.* at 10–11.

The later applications, seeking extensions and amendments of the initial application, as well as authorization to intercept telephone conversations, incorporated by reference the justifications set forth in the initial application, and provided yet further reasons why traditional investigative means were not sufficient. *See generally* GX 1(b) – 1(m). Thus, as the pager interceptions began to yield information about the identity of some of the defendant's coconspirators, it was clear that surveillance of the defendant with the coconspirators would not alone provide any evidence that the meetings involved criminal wrongdoing. Nor, if the meetings involved transfers of narcotics or money, would surveillance alone be likely to provide definitive evidence because such transfers would not be made in a manner that disclosed what was being transferred. *See* Affidavit of Jerome McCarthy, October 30, 1996, at 11–12 (found in GX 1(f)); Affidavit of Jerome McCarthy, November 26, 1996, at 14–15 (found in GX 1(g)). The first application for interception of telephone com-

munications, made when the investigation was nine months old, is particularly instructive about the various investigative means that had been used up to that point and provides a detailed explanation, not only of the extensive normal investigative techniques that were being employed along with the wiretapping—surveillances, pen registers, confidential informants, telephone records—but also of the limitations of those investigative techniques in obtaining evidence about the full scope of the defendant's operations. *See* Affidavit of Paul Vitucci, January 29, 1997, at 12–42 (found in GX 1(i)).

■■■ The defendant argues that the failure to conduct surveillance at the defendant's "stash house" in Lindenhurst and the failure to undertake records checks at the County Clerk's office to determine whether the defendant was married demonstrates the inadequacy of the investigative efforts undertaken by law enforcement officers before obtaining the first wiretap application. The argument seems to be that surveillance of the stash house and of the defendant's wife would ultimately have led the officers to the defendant, the further surveillance of whom would be successful in establishing the defendant's activities and coconspirators. Although those investigative steps were not taken, that is not fatal to the use of wiretap evidence here. First, it is not necessary that every conceivable investigative step be undertaken. *See, e.g., United States v. Diaz*, 176 F.3d at 110–11. Second, and more importantly, neither surveillance of the "stash house" nor identification of the defendant's wife would have been reasonably likely to be successful in identifying the coconspirators of the defendant. As explained above, mere surveillance would not establish which of the persons with whom the defendant met were involved in criminal activities, nor would it establish the purpose of the meetings. Moreover, conducting such surveillance without some clue as to when criminal activity might occur would require the

devotion of vast hours of time by law enforcement officers on a continuous basis on the sheer hope that at some point useful information about the defendant's conduct might emerge. Given the "practical and common sense manner" that governs the court's review of wiretap applications, *see id.* at 111, such extraordinary investigative efforts are not required as a prerequisite for obtaining wiretap authorization.

For the foregoing reasons, the court finds no basis to exclude the evidence obtained pursuant to the challenged electronic eavesdropping warrants.

### III. SEARCH AT 406 SOUTH 9TH STREET

The defendant seeks suppression of evidence obtained in a search of his alleged "stash house" at 406 South 9th Street in Lindenhurst on the grounds that the warrant pursuant to which the search was conducted was flawed. Specifically, he contends that the warrant was issued on the basis of information obtained from a warrantless canine sniff of the house which was itself an unlawful search in violation of the Fourth Amendment. Without that canine sniff, he argues, there was insufficient probable cause to justify issuance of the warrant; nor, he argues, does the "good faith" exception to the exclusionary rule articulated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) save the evidence in question from suppression.

#### A. *Facts*

On March 2, 1997, detectives from the NCPD executed a search warrant at a house located at 406 South 9th Street, Lindenhurst, New York. Pursuant to the warrant, known as a "sneak and peak" warrant because no seizures occurred and no immediate notice of the entry into the house was given, the detectives took photographs of the interior of the house which display various objects consistent with the alleged use of the premises as a base for narcotics trafficking. The defendant chal-

lenges the search warrant on the ground that it was based in part on information obtained by an unlawful canine sniff of the exterior of the house.

At the hearing on May 15, 2000, the government offered testimony by various witnesses concerning the events that led to the issuance of the search warrant, including the use of a United States Customs Service dog trained to detect the presence of certain narcotic substances. *See generally* Tr. 23–53, 70–82, 116–23. Before obtaining the warrant, NCPD detectives had received information from various informants, including information dating back to 1993, concerning the defendant's use of the Lindenhurst premises as a "stash house," that is, a location where he stored marijuana and other materials and equipment related to his drug activities. Through surveillance of the house on various occasions before obtaining the search warrant, the detectives observed the defendant entering and leaving the premises at odd hours, on at least one occasion carrying bags filled with weighty material which he then brought to a suspected marijuana dealer in Brooklyn. They also observed that no one appeared to reside at the house. The windows in the front were boarded over. *See* GX 10. A stockade fence which originally enclosed the back yard was in disrepair, and various panels of the fence were missing which gave unimpeded access to the rear of the house.

Armed with the above information, as well as information from the pen registers and wiretaps that had been obtained, NCPD detectives sought the assistance of the District Attorney's Office in obtaining a search warrant for the premises. Because the assistant district attorneys assigned to the matter wanted some confirmation that narcotics were stored in the premises before seeking the warrant, he and the detectives discussed the use of a canine sniff of the building. Although there was no concern among them about approaching the front of the house with a dog, because it was open and accessible to public approach, detective Paul Vitucci expressed concern about going around to the rear of the house. Members of the District Attorney's Office, including supervisors of the Rackets Bureau, assured him that, because no one lived in the building and the fence was down in spots, a canine sniff of the rear building presented no problem if it was limited to the exterior. Tr. 41–42.

On February 20, 1997, NCPD detectives accompanied Customs Officer Christopher Giurici and his trained dog Samson to the house at 406 South 9th Street. They walked from the street up the paved driveway and approached the two garage doors where Samson's sniffing at the garage door indicated the presence of narcotics. They then proceeded up the front steps to the front door, and then back down the steps and around to the right of the house where they proceeded through an opening in the fence to the rear of the house. Around the rear, Samson again detected the presence of narcotics at the rear door of the garage. The group then proceeded along the other side of the building back to the front yard through another opening in the fence at the front left side of the house. See Tr. 41–44, 77–82, 102–15, 117–18.

On February 26, 1997, Detective Vitucci signed and submitted his affidavit in support of the search warrant for the premises. The affidavit included information about the canine sniff along with information obtained from surveillance of the house and of the defendant, from the pen registers, and from the interceptions of electronic communications. Affidavit of Paul Vitucci, February 26, 1997, at 3–9 (found in GX 3). The affidavit also incorporated by reference all of the applications and affidavits submitted in connection with the previous eavesdropping warrants and pen register applications. *Id.* at 3. The search warrant was issued on February 26, 1997 by Nassau County Court Judge Donald Belfi.

## B. *Discussion*

The defendant's motion presents three issues for decision: first, whether the canine sniff constituted an unlawful search thereby rendering the results of the sniff unusable as a basis for the issuance of the search warrant; second, if the canine sniff was unlawful, in whole or in part, whether there was sufficient probable cause to support the issuance of a search warrant after the unlawfully obtained results were excluded from consideration; and third, if the canine sniff was an unlawful search, whether the good faith exception to the exclusionary rule articulated in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), nevertheless permits the government to use the fruits of the search conducted pursuant to the warrant.

### 1. *Was the Canine Sniff an Unlawful Search?*

The initial question to be resolved in addressing this issue is whether state or federal law should control. Unlike the eavesdropping issue above, the question is not merely academic because state and federal law diverge substantially on the question of acceptable law enforcement intrusion on private property. *Compare Oliver v. United States,* 466 U.S. 170, 182–83, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) (warrantless search of open fields beyond curtilage does not violate Fourth Amendment because no legitimate expectation of privacy in that area), *with People v. Scott,* 79 N.Y.2d 474, 491, 583 N.Y.S.2d 920, 593 N.E.2d 1328 (N.Y.1992) (rejecting *Oliver* and holding that warrantless entry by law enforcement officers on fenced or posted land violates the state constitution). At least since its decision in *United States v. Pforzheimer,* 826 F.2d 200 (2d Cir.1987), the Second Circuit has consistently held that federal law governs the analysis of suppression issues in federal prosecutions, even when the evidence at issue was gathered by state law enforcement officials in violation of state constitutional law and

would be suppressed in a state prosecution. *Id.* at 203–04; *accord, e.g., United States v. Workman,* 80 F.3d 688, 694–95 (2d Cir.1996); *United States v. Brown,* 52 F.3d 415, 420 (2d Cir.1995); *United States v. Smith,* 9 F.3d 1007, 1014 (2d Cir.1993). Thus, the analysis that follows rests solely on federal law.

The extent to which canine sniffs implicate Fourth Amendment considerations is not a completely settled question. In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court held that a canine sniff of luggage in a public place, in that case an airport, was not a search under the Fourth Amendment. *Id.* at 707, 103 S.Ct. 2637. The Court was guided in part by the limited intrusion of a canine sniff, that is, it does not expose noncontraband items to public view as would be the case if an officer rummaged through the luggage. *Id.* Relying on *Place,* a number of other circuits have held that canine sniffs in various other contexts do not violate the Fourth Amendment. *See, e.g., United States v. $404,905.00 in U.S. Currency,* 182 F.3d 643, 647 (8th Cir.1999) (exterior of U–Haul trailer on interstate highway); *United States v. Roby,* 122 F.3d 1120, 1124–25 (8th Cir.1997) (outside hotel room in public corridor); *United States v. Lingenfelter,* 997 F.2d 632, 637–39 (9th Cir.1993) (door of commercial warehouse from public alleyway); *United States v. Rodriguez–Morales,* 929 F.2d 780, 788–89 (1st Cir.1991) (exterior of impounded automobile); *United States v. Vasquez,* 909 F.2d 235, 237–38 (7th Cir.1990) (perimeter of garage from public alley); *United States v. Colyer,* 878 F.2d 469, 472–77 (D.C.Cir.1989) (exterior of Amtrak roomette from public corridor of train); *United States v. Hardy,* 855 F.2d 753, 759 (11th Cir.1988) (luggage in trunk of automobile). The Sixth Circuit has gone so far as to say that a canine sniff is never a search within the meaning of the Fourth Amendment. *United States v. Reed,* 141 F.3d 644, 650 (6th Cir.1998).

The Second Circuit, however, has taken a more restrictive view of canine sniffs. In *United States v. Thomas*, 757 F.2d 1359 (2d Cir.1985), decided shortly after *Place*, the court held that a canine sniff could be a search if it intruded on a legitimate expectation of privacy. *See id.* at 1366. Relying on the heightened privacy interest that the circuit has recognized for dwelling places, the court distinguished the airport luggage sniff that occurred in *Place* and held that a warrantless canine sniff at an apartment door from a public hallway constituted an impermissible search under the Fourth Amendment. *See id.* at 1367.

*Thomas* appears never to have been followed by any court outside the Circuit and has been criticized by several other circuit courts. Those courts have pointed out that the rationale underlying the *Thomas* decision conflicts with the underpinnings of the Supreme Court's holding that the canine sniff in *Place* did not constitute a search. *See United States v. Colyer*, 878 F.2d at 473–74; *United States v. Lingenfelter*, 997 F.2d at 638; *United States v. Reed*, 141 F.3d at 649–50. As the Supreme Court explained in *United States v. Jacobsen*, decided a year after *Place*, a person has no *legitimate* expectation of privacy as to his possession of contraband drugs; therefore, a canine sniff, which by its nature only reveals the presence of contraband and reveals nothing about noncontraband, invades no legitimate privacy interest. *See United States v. Jacobsen*, 466 U.S. 109, 123–24, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). *Thomas*, on the other hand, rested on the principle that the defendant there "had a legitimate expectation that the contents of his closed apartment would remain private." *Thomas*, 757 F.2d at 1367. To the extent that those "contents" included cocaine, however, *Place* and *Jacobsen* plainly reject the existence of any *legitimate* expectation of privacy. *See Colyer*, 878 F.2d at 475. To be sure, all persons, including criminal defendants, have a legitimate expectation of privacy as to all noncontraband items in their closed apartments. But since a canine sniff in a public corridor at the door of a closed apartment reveals nothing about the existence of any such noncontraband items in the closed apartment, it does not invade legitimate expectations of privacy. *See Jacobsen*, 466 U.S. at 124 n. 24, 104 S.Ct. 1652; *Colyer*, 878 F.2d at 475. *Thomas* thus appears to be at odds with *Place* and *Jacobsen*.

Although *Thomas* remains the law in this circuit, the foregoing discussion suggests that it should not be applied expansively. The central tenet of *Thomas*, the overriding principle upon which the court there relied, was "the heightened privacy interest that an individual has in his dwelling place." 757 F.2d at 1366. The instant case, however, does not involve the defendant's dwelling place. Indeed, there is no evidence that the house where the canine sniff occurred has ever been used as a dwelling place by anyone, and the NCPD detectives conducting the investigation at the time had a firm basis for concluding that it was not a dwelling place at the time of the canine sniff. Accordingly, *Thomas* does not apply to the situation now before the court.

Rather, this case presents facts akin to the warrantless canine sniffs of the garage in *United States v. Vasquez, supra,* and the commercial warehouse in *United States v. Lingenfelter, supra,* both of which were upheld in the face of Fourth Amendment challenges. Although the sniffs in those cases are distinguishable because they were conducted from public alleys, whereas the sniff here was conducted from the driveway, the front door and along the outer perimeter of the entire building, that distinction is not significant for Fourth Amendment purposes as long as the law enforcement officers had a right to be at the places where the sniff was conducted. *See United States v. Reed*, 141 F.3d at 650; *United States v. Taylor*, 90 F.3d 903, 908 (4th Cir.1996).

██ If the premises here had been the defendant's residence, the question wheth-

er the officers here had a right to be where the sniff was conducted would be a close question because of the common-law concept of curtilage which the Supreme Court has adopted to assist in defining the Fourth Amendment protections afforded to dwelling places. *See, e.g., United States v. Dunn,* 480 U.S. 294, 300–01, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *Oliver v. United States,* 466 U.S. 170, 178–80, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Thus, the Fourth Amendment protects against unwarranted government intrusion not only into the home itself, but also into the immediately surrounding area which is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Dunn,* 480 U.S. at 301, 107 S.Ct. 1134. But the concept of curtilage has not yet been expanded to commercial structures, and the Supreme Court specifically declined to adopt a concept of "industrial curtilage" in *Dow Chemical Co. v. U.S.,* 476 U.S. 227, 235–39, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1986).

▪ Here, the evidence clearly established that the house at 406 South 9th Street was not the defendant's dwelling place, nor anyone else's dwelling place for that matter, and there is no evidence that it was ever occupied by the defendant as a dwelling. Its boarded windows and the absence of any evidence of domestic activity provide ample proof that the house served no residential purpose. Accordingly, the concept of curtilage simply does not apply. *See, e.g., Dunn,* 480 U.S. at 300, 107 S.Ct. 1134 ("the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself"); *United States v. Reilly,* 76 F.3d 1271, 1275–77 (2d Cir. 1996).

Since the structure at 406 South 9th Street had no curtilage, the officers' approach to the building and the sniff around the perimeter of the house did not invade interests protected by the Fourth Amend-ment. The sniff along the front of the house at the garage doors and at the front door was the equivalent of the sniffs in *Vasquez* and *Lingenfelter, supra.* The sniff at the rear of the house, however, requires further analysis because the rear was partially enclosed by a fence. Thus, the rear area of the property may be likened in some ways to the commercial area addressed by the Supreme Court in *Dow Chemical,* which the Court characterized as perhaps "falling somewhere between 'open fields' and curtilage, but lacking some of the critical characteristics of both." 476 U.S. at 236, 106 S.Ct. 1819. The Court expressly left open the possibility that a physical entry into an enclosed outdoor commercial area would raise Fourth Amendment issues. *Id.* at 237, 106 S.Ct. 1819. Key to the Court's analysis on that issue, however, were the elaborate steps Dow had taken to enclose and protect its grounds from physical incursion by the public. That is not the situation here, where the fence surrounding the property was in such disrepair that the officers were able simply to step through places on both sides of the house where the fence had fallen down and no longer enclosed the rear of the house. Thus, the entry into the rear yard was not an impermissible intrusion, and the sniff at the rear of the house violated no Fourth Amendment interests.

For the foregoing reasons, the court concludes that the canine sniff was not an unlawful search in violation of the Fourth Amendment.

2. *Without the Canine Sniff, Was There Sufficient Probable Cause for Issuance of the Warrant?*

▪ Even if the canine sniff was unlawful, in whole or in part, the evidence seized pursuant to the search warrant would nevertheless be admissible if "there was a sufficient residue of probable cause to support the warrant, without considering the improper sniff." *United States v. Thomas,* 757 F.2d at 1367. Upon examin-

ing the warrant application, it is clear that if the results of the canine sniff are eliminated entirely from the warrant, probable cause for the search did not exist. The theory of the warrant application is that the building was a "stash house" where marijuana was being stored, and intercepted telephone conversations and surveillance provided evidence that the defendant was a marijuana dealer and that he visited the building from time to time. *See* Affidavit of Paul Vitucci dated February 26, 1997, found at GX 3. Without the canine sniff, however, the only evidence that the building might have been used to store marijuana was the fact that on one occasion the defendant was observed walking out of the house with two large shopping bags that appeared to be full and transporting them in his car to another house also believed to be a stash house. That is simply not enough to justify the issuance of a warrant to search the house for marijuana. *Compare, e.g., Thomas,* 757 F.2d at 1367–68. Without the canine sniff, then, the warrant application is fatally flawed.

The analysis in the preceding section of course concluded that the canine sniff was not unlawful, based largely on the determination that there was no curtilage annexed to the building at 406 South 9th Street. Even if that determination is erroneous, however, such that the defendant enjoyed some curtilage around the structure at 406 South 9th Street, the canine sniff conducted there was not wholly unlawful. The officers' initial approach to the house by way of the driveway up to the garage doors, where the dog first signaled the presence of narcotics, did not breach Fourth Amendment interests, because the driveway was not fenced off or otherwise protected from entry. Thus, an occupant of the house (if it were occupied) would expect visitors, including strangers, to approach the house in that manner and therefore would have no legitimate expectation of privacy in that area. *See, e.g., United States v. Roberts,* 747 F.2d 537, 542–43 (9th Cir.1984). For the same reasons, the officers' approach up the steps to

the front door of the house was not an impermissible invasion of Fourth Amendment interests. *See United States v. Hersh,* 464 F.2d 228, 230 (9th Cir.) (per curiam), *cert. denied,* 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972). The canine sniff in those areas therefore did not offend the Fourth Amendment and the information thereby obtained was appropriately used to establish probable cause for the warrant.

The sniff at the rear perimeter of the house is different, of course, because that area would not normally be an area where visitors would approach; accordingly, if the concept of curtilage applied it is likely that the officers' entry into that area would not be a permissible intrusion on the curtilage. *But see United States v. Morehead,* 959 F.2d 1489, 1495–96 (10th Cir. 1992) (approach to the rear of a dwelling when no one answered the door was not unlawful). But if the information obtained from the canine sniff at the rear of the house is excluded from consideration in evaluating the warrant application, there is still sufficient evidence of criminal activity at the house to support a finding of probable cause for the ensuing search. The canine sniff at the front of the house, which was proper, already established the likely presence of narcotics in the house. The sniff at the rear was merely cumulative. As noted above, the search warrant affidavit rested upon intercepted telephone conversations and surveillance of the defendant Hogan entering and leaving the premises at 406 South 9th Street under circumstances that corroborated its use as a stash house. Those intercepted conversations and surveillance, when coupled with the positive results of the canine sniff at the front of the house, provided ample probable cause for the issuance of the warrant.

3. *If the Canine Sniff Was Unlawful, Does* Leon *Nevertheless Save the Evidence from Suppression?*

 Even if the entire canine sniff is deemed unlawful, and the warrant is

thereby invalidated, the court is not required to suppress the evidence obtained from the search if the government can establish that the officers acted in good faith reliance on a facially valid warrant. *See, e.g., United States v. Leon,* 468 U.S. 897, 925–26, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Reilly,* 76 F.3d 1271, 1280 (2d Cir.1996). *Leon* is premised on the recognition that since the purpose of the exclusionary rule is to deter police misconduct, its purpose is not served when the police rely in good faith on a warrant issued in error by a neutral magistrate. *See Reilly,* 76 F.3d at 1281. Thus in *United States v. Thomas,* the Second Circuit declined to suppress evidence obtained on the basis of a warrant that was based on an unconstitutional canine sniff, because under *Leon* the officers who executed the warrant acted in good faith reliance on the magistrate's decision to issue the warrant. *See* 757 F.2d at 1368. More recently, however, in *United States v. Reilly* the Second Circuit carefully limited the extent to which *Leon* will save evidence obtained under a deficient warrant. There, the court refused to find that the officers acted in good faith reliance on a warrant because the warrant application failed to set forth sufficient facts from which the magistrate could have determined that crucial evidence in the application had been obtained by unlawful intrusions on the defendant's curtilage. *See* 76 F.3d at 1280–82.

■ There is nothing in the record to suggest that the officers in this case acted other than in good faith reliance on a validly issued warrant. They discussed their warrant application with the prosecutors and were advised to obtain more evidence by means of a canine sniff. Detective Vitucci of the NCPD expressly raised with the prosecutors whether a sniff at the rear of the house was lawful and was told that in the circumstances a sniff limited to the exterior was appropriate. Tr. at 41–42. The officers had no reason to question the soundness of the prosecutors' advice;

as the discussion above indicates, there is no decision in this circuit or elsewhere that prohibits such sniffs. The affidavit in support of the warrant which was signed and submitted by Detective Vitucci provided details concerning the appearance of the house and the neighborhood in which it was situated, and described precisely how the canine sniff was conducted around the perimeter of the house. It thus withheld no potentially adverse information concerning the sniff that might have changed the assessment by the issuing judge concerning the propriety of the information in the application. *Compare Reilly,* 76 F.3d at 1280–81.

Given the objective good faith and reasonableness of the officers' conduct here, the exception to the exclusionary rule established by *Leon* applies in this case. Thus, even if the canine sniff upon which the warrant was based was unlawful in its entirety, the evidence obtained under the warrant should not be suppressed.

For all of the foregoing reasons, the court finds no basis for suppressing the evidence obtained as a result of the search warrant obtained on February 26, 1997.

### III. SEIZURE OF BRIEFCASE

The defendant challenges the seizure and subsequent search of a briefcase that was obtained, without a warrant, from the trunk of the defendant's rented automobile at the time of his arrest. He argues that none of the well-recognized exceptions to the warrant requirement applicable to automobile searches absolved the agents from having to obtain a warrant to seize the briefcase.

### A. *Facts*

The defendant was arrested pursuant to a federal arrest warrant on January 5, 1999 as he approached the apartment building where his uncle resided in the Gramercy Park area of Manhattan. The defendant had arrived driving an automobile, and was walking to the entrance of

the apartment building when Special Agent Robert Koval of the DEA and other law enforcement officers from his task force group stopped the defendant on the sidewalk and asked about his identity. The defendant misidentified himself as his brother, Chris Hogan. In response to various further questions about his identity and the automobile in which he arrived, the defendant said he did not have any form of identification on his person. He did, however, produce a car rental agreement from the glove compartment which was in the name of Scott Hogan, and which he said had just been renewed that day. Agent Koval asked for and received consent to search the automobile for identification.

At some point in this process, in response to a request from Agent Koval, the defendant gave Koval a key to open the trunk of the automobile. Upon opening the trunk, Koval observed a briefcase, and obtained permission from the defendant to look inside the briefcase. When Agent Koval opened the briefcase, however, and before he had an opportunity to inspect the contents closely, the defendant announced again that there was no identification in the briefcase and then placed his hands on the briefcase and positioned himself in such a way as to prevent the agent from further searching inside the briefcase. Agent Koval saw what appeared to be a business card in the briefcase, and asked to see it. In response, the defendant obtained from the briefcase a business card bearing the name of his uncle, Ray Hogan, and gave it to Agent Koval. The defendant then closed the briefcase, returned it to the trunk, and closed the trunk of the car.

Agent Koval and at least one other detective from the NCPD then continued questioning the defendant on the sidewalk about matters relating to identification, including the defendant's date of birth and prior problems with the law. At first the defendant persisted in maintaining that he was Chris Hogan, but eventually admitted that he was in fact Scott Hogan. He was promptly advised of the arrest warrant, and placed under arrest. After the defendant was arrested, without the consent of the defendant, one of the NCPD detectives returned to the trunk of the car, opened it with the key obtained from the defendant, and withdrew the briefcase. The briefcase was then transported to DEA offices in Long Island and eventually turned over to the prosecutors. The contents of the briefcase were photocopied by the government, and the briefcase and the original contents were ultimately returned to the defendant's attorney.

The defendant has now moved to suppress the evidence obtained from the briefcase on the grounds that it was unlawfully seized without a warrant. The government defends the seizure on the grounds that it was the product of a lawful search incident to arrest.

**B. Discussion**

■ "The Fourth Amendment proscribes all unreasonable searches and seizures," *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), and evidence seized in violation of the Fourth Amendment must be suppressed. *See, e.g., Weeks v. United States*, 232 U.S. 383, 393–99, 34 S.Ct. 341, 58 L.Ed. 652 (1914); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920); *Olmstead v. United States*, 277 U.S. 438, 462, 48 S.Ct. 564, 72 L.Ed. 944 (1928); *Mapp v. Ohio*, 367 U.S. 643, 648–49, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). As a general rule, searches conducted without a warrant "are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *Mincey v. Arizona*, 437 U.S. at 390, 98 S.Ct. 2408 (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)).

■ Among the well-delineated exceptions to the warrant requirement established by the Supreme Court are searches

incident to arrest and certain searches of automobiles. Thus, law enforcement officers may make a thorough search of the person of an arrestee both for weapons and for evidence of criminal activity. *See United States v. Robinson,* 414 U.S. 218, 232–36, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). They may also search areas within the immediate control of the arrestee to prevent the arrestee from obtaining a weapon or destroying evidence. *See Chimel v. California,* 395 U.S. 752, 762–63, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). As to automobile searches, under the so-called "automobile exception" recognized in *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), the police may conduct a warrantless search of an automobile provided they have probable cause to believe the automobile contains contraband or evidence of a crime. *See id.* at 47–52, 90 S.Ct. 1975. The same principle applies to the warrantless search of a closed container within an automobile: the police may search such a container provided they have probable cause to believe that the container houses contraband or evidence. *See California v. Acevedo,* 500 U.S. 565, 579–81, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991).

 It is undisputed that the agents did not have a warrant to seize and search the contents of the briefcase at issue here. Nor does their search and seizure fall within any of the above exceptions. At the time of the arrest of the defendant, the briefcase was not on his person. Nor was it in an area within his immediate control because it was locked within the trunk of the automobile. *Cf. Arkansas v. Sanders,* 442 U.S. 753, 764 n. 11, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (suitcase in locked trunk not within immediate control of arrestee) (dictum), *overruled on other grounds by California v. Acevedo,* 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991); *see also New York v. Belton,* 453 U.S. 454, 462, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). The seizure and search of the briefcase therefore does not

qualify as a lawful search incident to arrest. Nor does the seizure and search of the briefcase fall under the automobile exception because the government has not established that the seizing agents had probable cause to believe that the briefcase contained contraband or evidence of a crime at the time it was seized. Indeed, they had already viewed the contents of the briefcase, albeit briefly, but were confident that it did not contain a weapon, and had otherwise observed only various papers whose contents and significance were then unknown.

 The "plain view" doctrine, upon which the government also seeks to rely, is not applicable. "Under that doctrine, if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson,* 508 U.S. 366, 374, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993). Whether an object's "incriminating character is immediately apparent" is a factual matter for the district court, and is an essential prerequisite for a finding that the "plain view" doctrine applies. *See, e.g., United States v. Scopo,* 19 F.3d 777, 782 (2d Cir.1994); *United States v. Jenkins,* 876 F.2d 1085, 1088 (2d Cir.1989) (per curiam). As stated above, the agents here did not have probable cause to believe the suitcase or its contents constituted evidence of a crime, even after having cursorily viewed them. A fortiori, the incriminating character of the contents was not immediately apparent.

Accordingly, the court concludes that the seizure and search of the briefcase was in violation of the defendant's Fourth Amendment rights, and the evidence gained must be suppressed. *See, e.g., Weeks, supra; Silverthorne, supra; Olmstead, supra.*

## III. CONCLUSION

For the foregoing reasons, it is my RECOMMENDATION that

1. the defendant's motion to suppress wiretap evidence be DENIED;

2. the defendant's motion to suppress evidence obtained from the search of 406 South 9th Street, Lindenhurst, New York be DENIED; and

3. the defendant's motion to suppress evidence obtained from the briefcase seized at the time of his arrest be GRANTED.

&ast; &ast; &ast; &ast; &ast; &ast;

Any objections to the Report and Recommendation above must be filed with the Clerk of the Court with a copy to the undersigned within 10 days of receipt of this report. Failure to file objections within the specified time waives the right to appeal the District Court's order. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *IUE AFL—CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health and Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989) (per curiam).

July 24, 2000.